IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

04 MAR 10  PM 3: 49

BIG LOTS STORES, INC.;            )
CONSOLIDATED PROPERTY             )
HOLDINGS, INC.                    )
                                  )
         Plaintiffs,              )
                                  )
v.                                )          CV 02-PT-2128-M
                                  )
TONY WALKER, an individual; and   )
50% LESS AND MORE STORE, INC.,    )
An Alabama Corporation            )
                                  )
         Defendants.              )

**ENTERED**
MAR 10 2004

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause comes to be heard on the parties' cross-motions for summary judgment, filed

on November 14, 2003.  Defendants Tony Walker ("Walker") and 50% Less and More Store,

Inc. ("50% Less and More Store"), d/b/a Little Lots ("Little Lots") have moved for summary

judgment on plaintiffs' Big Lots Stores, Inc. ("Big Lots") and Consolidated Property Holdings,

Inc. ("CPHI") (collectively "Big Lots" or "plaintiffs") trademark infringement, false designation

of origin, state law dilution,[1] and Alabama "palming off" claims.  Plaintiffs have also moved for

partial summary judgment.[2]

### FACTS[3] AND PROCEDURE

Plaintiff CPHI is a corporation organized and existing under the laws of the State of Nevada,

---

[1] Big Lots's federal dilution claim has been voluntarily dismissed with prejudice, *see infra*.

[2] Defendants contend that plaintiffs' motion for partial summary judgment must only address
the trademark infringement and false designation of origin claims.  However, plaintiffs' response
to defendants' motion for summary judgment appears to address all the claims in the complaint.

The fact and argument sections of this Findings of Fact and Conclusions of Law overlap
somewhat.  While the court has tried to avoid undue repetition, some repetition is inevitable due
to the cross-motions.

[3] These "facts" are taken from both the court's November 2002 Findings of Fact and
Conclusions of Law as well as new submissions by the parties.

with its principal place of business in Las Vegas, Nevada.  Plaintiff Big Lots (formerly known as Consolidated Stores Corporation), is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.  Defendant Walker is the principal stockholder of defendant 50% Less & More Store.[4]  50% Less & More Store is an Alabama corporation with its principal place of business in Alabama.  50% Less & More owns and operates a division in Boaz, Alabama doing business as "Little Lots."

Plaintiff CPHI is the owner of the service mark Big Lots, which is a registered trademark, along with several other mark registrations, including Big Lots BARGAINS CLOSEOUTS; Big Lots FURNITURE; and Big Lots THE CLOSEOUT STORE.  Plaintiff Big Lots is the licensee of the BIG LOTS Mark.  Big Lots and its affiliates operate retail stores under the BIG LOTS Mark and other marks in over forty-five states, for a total of over 1,350 retail stores.[5]  Big Lots converted all of its stores, including its Pic'N'Save and MacFrugals stores, to stores which bear the Big Lots name.[6]  Big Lots sells "broad line merchandise" at below-discount prices, offering a wide selection of products from the world's leading manufacturers as well as goods under the Big Lots private label.  The Form 10-K filed by plaintiffs stated: "The Company competes with discount stores (such as Wal-Mart, Kmart and Target), dollar stores, deep discount drug store chains, and other value-oriented specialty retailers."  Big Lots also

---

[4] Since the 1960's, defendants argue, Walker has engaged in the acquisition at salvage and subsequent discount sale of general merchandise in the same general community. Approximately twenty years ago, Walker established the 50% Less and More Store, which was first located in Boaz and later moved to Albertville, Alabama. Both Walker and his store are well-known in the community, defendants contend.  While the 50% Less and More Store was for a number of years engaged in the discount sale of general merchandise, Walker testified that the 50% Less and More Store increasingly became associated with the sale of groceries, thus leading to Walker's desire to open a new store.

[5] Big Lots calls itself "the nation's leader in the business of 'closeout retailing,' which is the business of selling consumer goods at below-discount prices."

[6] Based on Big Lots's admission that "the process of converting the Odd Lots, Pic'N'Save, and MacFrugals stores into Big Lots stores continued until the end of 2002," the court assumes the process is complete.  *See* Def. Ex. A.

targets a repeat customer base by stocking items it refers to as "never out items."[7]  According to defendants, Big Lots stocks over 500 such items in its stores, in order to be perceived as "a reliable place to shop."  *See* Amy Tsao, <u>Big Lots: A Premium on Being Cheap</u>, BUSINESS WEEK ONLINE, August 14, 2002, available at www.businessweek.com. Big Lots tags some of its goods with the BIG LOTS mark (adding an exclamation point at end), scans customer purchases at point of business, and bags customer purchases in plastic bags bearing the BIG LOTS mark.

The BIG LOTS mark was first used by CPHI's predecessor in interest as early as June 1, 1985 to identify its retail store services.  The BIG LOTS Mark was first used in interstate commerce by CPHI's predecessor in interest as early as September 18, 1985.  The BIG LOTS Mark was first registered on the Principal Register of the United States Patent & Trademark Office on August 12, 1997 (Reg. No. 2,087,643) (the "Big Lots Registration").  The Big Lots name and mark have been in exclusive and continuous use by CPHI, its predecessors, or licensees to identify retail store services since first putting the mark into use.[8]

CPHI currently maintains the following additional federal service mark registrations on the Principal Register of the United States Patent & Trademark Office for marks incorporating the term "Big Lots": Big Lots BARGAINS CLOSEOUTS (Reg. No. 2,336,292); Big Lots FURNITURE (Reg. No. 2,255,148); and Big Lots THE CLOSEOUT STORE (Reg. No. 2,236,529) (collectively, the "BIG LOTS Marks").

Due to the continuous and exclusive use of the BIG LOTS Mark by CPHI's licensee, CPHI filed a Combined Affidavit of Continued Use and Incontestability with respect to the Big Lots Registration (Reg. No. 2,087,643) with the United States Patent & Trademark Office.  The BIG LOTS Marks are registered for use with "retail store services in the field of a variety of

---

[7] By contrast, defendants contend, Little Lots does not stock direct manufacturer-acquired goods, "never out items," or private label goods.

[8] By virtue of this exclusive and continuous use, Big Lots contends, the BIG LOTS Registration is incontestable under the Lanham Act.

goods." Big Lots is the licensee of the trademarks and service marks of CPHI, including the federally registered BIG LOTS Marks.

According to defendants, Big Lots began to emphasize and develop the "BIG LOTS" name beginning in May 2001, when it began the process of changing its many store names and company name (formerly Consolidated Stores Corporation) to one national brand.[9]  Through the end of 2002, Big Lots still operated many of its stores under the names Odd Lots, Pic 'N' Save, and MacFrugals.  Defendants rely upon statements from the Big Lots website and newspaper articles to support the following: Big Lots only recently completed the process of converting an array of store names to stores which bear the "BIG LOTS" name (See Newscenter: Frequently Asked Questions, at www.biglots.com ); the reason cited by Big Lots for converting all of its stores to the "BIG LOTS" name was to build a national brand (See Press Release, Big Lots Rolls Out New National Image, April 8, 2002, also at Big Lots's website); and Plaintiffs commissioned a study in 2001 which revealed that only 15% of the national population was familiar with the "BIG LOTS" name. See Big Lots Casts A Wider Net: The Closeout Retailer

---

[9] On the contrary, Big Lots contends: "This was actually the end of a process, not the beginning."  Big Lots relies on the following declaration from Timothy Anderson, Big Lots Vice President of Store Control:

> I understand that the defendants in this case have made statements to the effect that "Big Lots began to emphasize and develop the 'BIG LOTS' name beginning in May 2001 . . . . " Such statements are extremely inaccurate.
>
> In March 2001, Big Lots announced that it intended to transition all of its existing stores to the BIG LOTS mark.  Prior to March 2001, Big Lots operated stores under not only the mark BIG LOTS, but also under the names Big Lots Furniture, Odd Lots, Odd Lots Furniture, MacFrugal's, and Pic 'N' Save.  However, to say that we only began to 'emphasize and develop' the BIG LOTS mark at that time is grossly misleading.
>
> As of March 2001, we operated a total of 1,291 stores.  Of those 1,291 stores, 923 (over 70%) operated under the name BIG LOTS.  The remaining 368 operated under one of the other names; namely, Big Lots Furniture, Odd Lots, Odd Lots Furniture, MacFrugal's, and Pic 'N' Save.
>
> Specifically, with respect to the stores we currently have in Northeast Alabama . . . those nine stores have operated under the name BIG LOTS since their respective opening dates, and not under one of the other names.

<u>Closes In On Higher-Income Customers</u>, CHAIN STORE AGE EXECUTIVE WITH
SHOPPING CENTER AGE, October 2002, available at www.lexis.com ).[10]

Big Lots and its affiliates operate retail stores under the BIG LOTS Mark in over forty-five states, for a total of over 1,350 retail stores. Big Lots stores are designed to be uniform in appearance, and merchandise in its stores is arranged by departments according to a pattern developed at the corporate level.[11]  As of February 2002, Big Lots operated thirty-four retail stores under the BIG LOTS Mark in Alabama. Big Lots opened its first Alabama store under the BIG LOTS Mark in November 1988 in Decatur. Big Lots opened additional Big Lots stores in Alabama between 1988 and 2003, and presently has a total of thirty-three Big Lots stores in Alabama. Nine of those stores are in Northeast Alabama, and all opened prior to the opening of "Little Lots" in Boaz. As early as 1989, Big Lots had additional stores in Cullman, Huntsville, and Gadsden. In June 1996, Big Lots opened its Guntersville store.

Big Lots operates in the business of "closeout retailing," i.e., selling broad line merchandise at below-discount prices. The merchandise offered in Big Lots's retail stores are often the result of product or packaging changes, manufacturer overruns, excess inventories, or discontinued product lines. Big Lots's primary merchandise is acquired in a regular and systematic basis directly from manufacturers through Big Lots's purchasing arrangements, and 30-35% of its products are purchased directly from overseas suppliers.[12]

Big Lots has expended substantial resources in advertising and promoting the BIG LOTS Marks since its predecessor began using those marks. Since Big Lots began using marks incorporating the phrase "Big Lots" in 1985, Big Lots has made significant advertising

---

[10] Big Lots contests this "fact."  *See infra*.

[11] By contrast, defendants assert, the Little Lots store is not organized into departments, and similar items may be located in several different places in the store.

[12] According to defendants, these facts indicate that Big Lots "always knows what goods it will have to offer," in contrast to Little Lots, which does not know in advance what goods it will have to offer on any particular day, since Little Lots's inventory depends on what goods Walker has been able to acquire on a spot purchase basis.

expenditures to promote its services offered under the BIG LOTS Marks.  Currently, plaintiffs advertise primarily on television (with some advertisements featuring celebrity Jerry VanDyke) and in local newspaper inserts.  These inserts have appeared in high-circulation newspapers, including The Huntsville Times in Alabama.  Big Lots also advertises on an Internet website. Big Lots has advertised its stores and the BIG LOTS Mark extensively not only nationwide but also extensively in Northeast Alabama.  In recent years, Big Lots has spent between $450,000 and over $550,000 annually on advertising using the BIG LOTS Marks in the Northeastern Alabama market (which includes Guntersville).

Little Lots is a local retail business located in Boaz, Alabama, engaged in the discount sale of miscellaneous merchandise which defendant Walker locates and purchases at salvage. The Boaz store is approximately thirteen miles from the closest Big Lots store (located in Guntersville).  Much of Walker's merchandise must be reprocessed and cleaned up before being placed in the Little Lots store.  Most of defendants' merchandise is displayed loose or in bins, often without its original packaging.  Little Lots handwrites its pricing (on terms such as "3 for $1"), has no scanning equipment or bar codes on its merchandise, and places packages in whatever generic plastic bags it has acquired at salvage.  Little Lots does not stock direct manufacturer acquired goods, "never out items," or private label goods.  Little Lots does not claim to maintain a target customer base, its typical customer being someone "looking for a deal."

Defendants opened Little Lots on or around July 1, 2002.  Through the Little Lots retail store, defendants offer retail services which include operation of a discount store where common items can be purchased at extreme discount or distressed prices.  The items typically offered by defendants under the Little Lots name include a combination of popular name-brand items and other goods that are not associated with a known name-brand.  Little Lots sells discontinued,

damaged, or distressed merchandise at the store.[13]

Both stores are retail outlets offering a wide variety of broad line, name brand, and non-name brand merchandise priced at deep discount or closeout prices. Both stores are located in shopping centers having multiple other stores in the shopping center and a large parking lot serving the center. Defendants lease the building in which the present Little Lots store is located and use the property solely for use as a retail store for the sale of any and all closeout and/or liquidated merchandise. Both stores have the name in large letters above the front entrance. Big Lots also states "THE CLOSEOUT STORE" beneath its name. Both stores have over twenty thousand square feet of floor space. Employees of Little Lots wear smocks or badges that bear the name Little Lots. Employees of Big Lots wear smocks or shirts that bear the name Big Lots.

Both plaintiffs and defendants carry merchandise that has been purchased at discount or closeout, although defendants characterize some of their merchandise as "salvage" items. A portion of defendants' merchandise in the Little Lots store is not organized for tidy display, instead being loose and in bins. Typically, Big Lots organizes its products for sale in original packaging in a tidy display on racks, shelves, or hangers.

Both stores advertise in print media, i.e., local newspapers. Big Lots's advertising is more extensive and sophisticated. Plaintiffs' print advertising uses color printed inserts in local newspapers, whereas defendants' print advertising uses black and white ads in the body of the newspaper. On Big Lots signs and advertising, the words "Big Lots" appear in capital letters in either black or orange print accompanied by a large exclamation mark (!) to read "BIG LOTS!". According to defendants, Little Lots regularly advertises only in the small local newspaper (The Sand Mountain Reporter), on the local Boaz radio station, and on a few local roadside

---

[13] While Little Lots's items often are of a lower quality than those found in Big Lots stores, and are sometimes "salvage" items, plaintiffs argue, the items fall the same category as the discontinued, damaged, or distressed merchandise which is the foundation of Big Lots.

billboards.[14]  Little Lots's roadside billboards refer to Tony Walker and prominently feature his

slogan "Tony Says Good Stuff Great Prices."[15]  Defendants display the name "Little Lots" in

black and white print advertising and in red lettering on the store and on billboards.  The "Little

Lots" name appears in red letters above the front entrance of the store without any qualifying

phrase or exclamation point.

 For about a month prior to the Little Lots grand opening and for a similar period

thereafter, defendants ran black and white ads in the local newspapers and ran short spots on the

three Sand Mountain radio stations.  One newspaper ad which ran on a daily basis clearly

identified Tony Walker and his wife as the owners of Little Lots, thanked the customers of the

50% Less and More Store for their patronage, and encouraged customers to visit their new store,

"Little Lots."[16]

 Defendants received a number of customer inquiries (approximately ten times between

July and September 2002) about the relationship or affiliation between Big Lots and defendants'

Little Lots store.[17]  Walker testified that the Little Lots store had approximately 50,000

customers during its first month.  On multiple occasions in mid-and late-summer 2002,

---

[14] Big Lots highlights defendants' use of an Ebay Internet site to advertise "Little Lots."
Defendants assert that the Internet "Little Lots" is not advertising, *see infra*.

[15] According to defendants, Big Lots does not use billboards or similar slogans.

[16] The newspaper advertisement stated:

> Thank you, Sand Mountain and all of North Alabama from the Staff & Owners of
> 50% Less and More Store, Inc.  Thanks for your patronage over the past 20 years,
> and your continued support in the future.  Thanks to all of you, our future looks
> even brighter with the forthcoming opening of LITTLE LOTS.  Located in the
> newly named Boaz Value Center on Mill Street, in the former Reading China and
> Glass location.
> Starting July 1st, you will be able to shop over 28,000 square feet of unbelievable
> bargains.  From closeouts, liquidations, store buyouts and merchandise from all
> around the world.  Hope to see you there!  Tony & Nancy Walker, owners.

[17] Specifically, Walker admitted, a Little Lots customer stated: "We have a Big Lots in our
hometown, but I have never heard of Little Lots."  Walker further stated that other customers
have called the Little Lots name "cute" in comparison to the Big Lots name.

customers at plaintiffs' Big Lots store in Guntersville asked employees of Big Lots about the Little Lots and whether there was an affiliation between Big Lots and the Little Lots store.[18] Walker informed anyone who inquired that his store was independent and not affiliated with Big Lots.

Defendants did not consult an attorney about using "Little Lots" as a name for their Boaz store. Defendants did not conduct or commission any trademark or trade name search prior to opening the Boaz Little Lots. Prior to opening his Little Lots store in Boaz, Walker was aware of Big Lots stores, including the one in Guntersville.

In 1993, Walker opened and operated a store in Cullman, Alabama which displayed a handmade sign saying "Little Lots." That store, which closed in 1994, was located in a "flea market" type complex called Country Village, was a stand-alone building, and had approximately 500 square feet of floor space. The Cullman store bore no resemblance to defendants' current Little Lots store. Prior to opening that Cullman store, Walker had heard of Big Lots stores. Big Lots observes that there had been a Big Lots store in Cullman since 1989.

Between 1994 (when the Cullman weekend store closed) and July 2002 (when the Boaz Little Lots store opened), defendants did not operate any store under the name "Little Lots" or have any interest in any operation using that name. The evidence also shows that plaintiffs opened the first store under the BIG LOTS Mark in Alabama in November 1988, in Decatur, Alabama, prior to any use of the name "Little Lots" by defendants, and then opened the Guntersville Big Lots store in June 1996. While Walker had heard of the name "Big Lots" upon opening the Little Lots store in Boaz, Walker testified that he did not give it any consideration in choosing "Little Lots" as the name for his store.

In 1999, Walker pled guilty to a misdemeanor for receiving stolen property (grocery-related items). When asked whether Walker had received inquiries by any law enforcement

---

[18] Big Lots argues that these were not casual inquiries; in some cases the inquiry was as specific as "when is Big Lots going to open the Little Lots."

officers in the past concerning any possible stolen goods, Walker testified to two previous incidents: (1) "probably 25 years ago" "rewholesaling" a quantity of stolen clocks Walker had bought (law enforcement officials investigated this incident but did not charge him); and (2) after Walker was at 50% Less and More, purchasing some stolen clothing items which he disposed of within 24 hours of obtaining (the FBI investigated this incident but did not charge him).

In mid-September 2003, UAB Professor Larry Powell, PhD.[19] conducted a survey ("the Powell survey") of a random sample of 500 residents of the six-county area composed of Marshall, Etowah, Dekalb, Blount, Calhoun, and Madison counties.[20] Dr. Powell's survey had two components: (1) a license plate survey of automobiles in the parking lots of the factory outlet malls in Boaz, in order to identify the Alabama counties which would serve as the market sample for the substantive survey and (2) a substantive telephone survey with four main components other than the qualifying and demographic questions.

In the telephone survey, respondents were first asked to indicate their impression of several retail stores in the Boaz and Guntersville area. The stores included not only Big Lots and Little Lots but also stores like Wal-Mart and factory outlets. That portion of the survey indicated that 95% of the respondents recognized Big Lots and 74% recognized Little Lots. Then, survey respondents were asked for their view of a connection between Big Lots and Little Lots. About one-third (34%) of the respondents responded that they did believe Little Lots was connected with Big Lots, one-third (33%) responded that they were uncertain about any connection, and one-third (33%) responded that they thought there was no connection between Little Lots and Big Lots.

Then, the Powell survey asked respondents to give their impression of the type of merchandise that would be available in a store called Little Lots. Respondents believed that a

---

[19] Big Lots describes Dr. Larry Powell as a "veteran pollster" and "one of the top communication researchers in America."

[20] The Powell survey was conducted at Big Lots's request.

store called Little Lots would stock factory seconds (76%) and discontinued, damaged, distressed, or out-of-date merchandise (71%). 73% of respondents did not believe such a store would stock fine jewelry. Big Lots contends that these results are consistent with what Walker actually stocks at the Little Lots store.

Finally, the telephone survey included a stimulus-response test that asked respondents to respond to a stimulus word by stating the first word that came to mind. Over half of the respondents (58%) immediately responded "Big" when presented with the word "Little." Over half of the respondents also responded with an "opposite" word for the words "Young" (66%), "Wet"(59%), "Off" (67%), and "Bad" (64%).[21]

Big Lots also offers the report and declaration by Mark Hickson, Ph.D., a professor of Communication Studies at UAB, who summarized research in the field of "Word Stimulus-Response Pairs." This research indicated that typical responses to stimulus words can be broken down into "patterned responses", i.e., (a) opposites, (b) synonyms, (c) related words, and (d) words that indicate a characteristic of a given word. Dr. Hickson then examined the Powell survey results and noted: "The results of Dr. Powell's survey were consistent with the general research in communication studies that opposites are quite common responses to stimulus words, and indeed, that a response to 'little' is most often 'big.'" Dr. Hickson concluded:

> Based on this review of available information, general academic research, and research specific to the "Little Lots"/"Big Lots" controversy, I believe that using as a company name, especially in the same general line of business, "Little Lots," [is] suggestive of the well-established company "Big Lots" in the minds of the public. Customers are likely to believe that the companies are connected with one another because the terms "little" and "big" have already been paired in their minds.

Relying upon information contained in their previous "Brief Addressing the Widespread Use of the Terms 'Big' and 'Little' in the Business World,"[22] defendants contend, the words in

---

[21] Big Lots argues: "This final portion of the survey has particular significance because it shows in practice the results predicted by research in the Communications Studies field."

[22] Hereinafter, the court also describes this document as the "third-party usage brief."

11

plaintiffs' marks are utilized extensively in business names nationwide, particularly in the
context of consumer product sales.  Defendants argue:

> Some examples of third-party usage in Ohio, which is Big Lots' state of
> incorporation and principal place of business, include "Mini Lots," a
> business specializing in the "remarketing of distressed merchandise";
> "Lots for Less," a self-described "retail store for groceries and consumer
> goods"; Roses's Little Lots Thrift Shop, and "L.O.T.S. Inc.", whose
> stated purpose is, among other things, to purchase or otherwise acquire,
> sell or otherwise deal in, goods, wares and merchandise and personal
> property of every class and description.  Additionally, the State of
> Michigan is home to a registered entity named Little Lots, L.L.C..

As evidence of "Little Lots" being a widely used mark elsewhere, defendants also note an
"Ebay" internet website (www.ebay.stores.com/littelots) named "Little Lots" with the slogan:
"We Specialize in Closeout, Liquidation, and Overstock items of all kinds, and have been doing
so for 20 years."  However, this website was created by Walker, as discussed later in this
Findings of Fact and Conclusions of Law.[23]  Defendants argue that the above-stated evidence
shows that there is extensive, nationwide business usage of the terms "Big" and "Little"
followed by the same word.  Defendants argue: "The evidence showed that in Alabama alone
there are more than thirty (30) pairs of companies that are using or have used 'Big' and 'Little'
followed by identical or very similar words."

On August 30, 2002, Big Lots filed a complaint against defendants alleging false
designation of origin (Count I), federal trademark infringement (Count II), dilution of famous
mark (Count III), dilution of mark under Ala. Code § 8-12-17 (Count IV), injunctive relief for
damage to reputation (Count V), and Alabama "palming off" violations (Count VI).[24]  On August
30, 2002, Big Lots also moved for a preliminary injunction.[25]  This court denied Big Lots's

---

[23] Plaintiffs argue: "This is a website planted by Walker himself, apparently to create an
argument which would mislead the Court!"  Big Lots also argues that the slogan about 20 years
is misleading and inaccurate.  For defendants' response, *see infra*.

[24] On September 11, 2002, Big Lots amended its complaint to add 50% Less and More as a
defendant.

[25] This motion was amended on September 11, 2002.

motion for a preliminary junction on November 22, 2002, issuing Findings of Fact and Conclusions of Law plus an Order.[26]  On December 20, 2002, plaintiff appealed the November 22, 2002 decision to the Eleventh Circuit.  On July 14, 2003, the Eleventh Circuit affirmed this court's denial of the motion for preliminary injunction.[27]

On December 12, 2003, the parties filed a joint Stipulation of Dismissal With Prejudice of Federal Dilution Claim (Count III of the complaint), which this court granted on December 4, 2003.  The parties' cross-motions for summary judgment and plaintiffs' Motion to Strike, filed on December 2, 2003, are now before this court.[28]

---

[26] Among other things, this court's November 2002 Findings of Fact and Conclusions of Law stated:

> Except for the words themselves, there is absolutely no likelihood of confusion by people who see the stores, their layouts and their products.  The evidence shows that the LITTLE LOTS store does not have the quality of goods, display, and format that plaintiffs do in their BIG LOTS stores.  "Big Lots" has an obviously more sophisticated operation with an apparently better line of products and display.  The advertising, although both use newspapers, is obviously distinguishable in form, color and layout.

> The court particularly notes the use of the word "lots" in such terms as "odd lots," "job lots," "tot lots," "case lots," "custom lots," "mix-a-lots," "bargain lots," "stock lots," "food lots," "mini lots," "scattered lots," "unique lots," etc.

The court also concluded:

> *In discussing the substantial likelihood of success on the merits, the court will not be making any final factual determinations.* FN 3.  Neither are any findings of fact stated above to be considered final.  They relate only to a consideration of the appropriateness of a preliminary injunction.  The court has also considered the parties' submissions in response to the court's post hearing order(s). (Emphasis added).

[27] *See infra* note 77.

[28] In its motion to strike, Big Lots objects to the following summary judgment exhibits: D, E, K, L, M, and N (newspaper, magazine, or on-line articles located by defense counsel); B and C (purported excerpts from Big Lots's website); I and J (purported complete Big Lots Annual Reports for the years 2002 and 2000); and P (a purported advertisement for Little Lots). Additionally, Big Lots seeks to strike Appendix 1 and Exhibits A, B, and C to defendants' third-party usage brief.  This brief was submitted by defendants in response to a court order dated October 29, 2002.  The motion to strike is discussed in detail *infra*.

13

## ARGUMENTS

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I.      **Plaintiff's Motion**

     A.      **Introduction and Undisputed Facts**

     According to Big Lots, the Powell survey[29] coupled with expert testimony and other material undisputed facts demonstrates likelihood of confusion as well as actual confusion between the defendants' use of the name "Little Lots" and Big Lots's senior use of the BIG LOTS Mark.  Big Lots also relies upon evidence regarding customer inquiries and confusion, not only from Big Lots employees but also Walker himself,[30] as evidence of actual confusion of customers or potential customers.

     Likelihood of confusion between the junior and senior users' marks, Big Lots asserts, is the "ultimate and decisive issue in trademark litigation."  If such likelihood of confusion exists, Big Lots argues, the senior user is entitled to injunctive and other relief.  The parties agree on the Eleventh Circuit's multi-part test for likelihood of confusion, which involves consideration of the following factors: "(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his produce with the plaintiffs' established mark; and (7) actual confusion." *See Alliance Metals, Inc. v. Hinley Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000).[31]  Big Lots contends, "[W]e now have direct and undisputed proof of likelihood of confusion which was not before the Court at

---

    [29] The survey and its results are discussed earlier in this Findings of Fact and Conclusions of Law.

    [30] Facts pertaining to this evidence are discussed earlier in this Findings of Fact and Conclusions of Law.

    [31] The court notes *Alliance's* statement: "The most persuasive evidence in assessing the likelihood of confusion is actual confusion." *Id.* at 907.

the preliminary injunction stage of this case.  This evidence, embodied in a carefully conceived and well-executed professional scientific survey, cuts across and measures all of the individual factors." Big Lots argues that the survey results are especially conclusive with respect to the "strength of the senior mark," "similarity of the marks," and "actual confusion" factors.

### B.   Survey Conclusively Establishes Likelihood of Confusion

#### 1.   Careful Methodology

Big Lots touts the Powell survey's methodology. First, plaintiff contends, Powell established the correct "universe" for the survey by determining the geographic areas from which most of the Boaz shopping traffic is drawn.  This process required manual counting of license plates in "every one of the several major parking lots in Boaz on two separate days, a weekend day (Saturday) and a weekday (Tuesday)."  From this license plate survey, it appeared that 86% of the shoppers came from a six-county area, with the largest percentage (45%) coming from the home county of Marshall.  The six-county area was thus chosen as the geographic survey area.

According to Big Lots, the Powell survey was conducted by "independent operators" who were unaware of who commissioned the survey or the survey's purpose.  As a "double blind" survey, Big Lots argues, it was the most reliable kind.[32]  Big Lots goes on to describe the next three parts of the survey, which have already been discussed in this Findings of Fact and Conclusions of Law.  According to Dr. Powell, the survey's margin of error was plus or minus 4.4%, with a 95% confidence level.

#### 2.   Survey Results Establish Likelihood of Confusion, and Even Actual Confusion

Big Lots summarizes the survey as follows:

---

[32] Big Lots asserts: "The respondents were randomly chosen by a computer from telephone listings designed to select the correct number of persons from the six-county area in proportions representing the patronage of Boaz area shopping from the respective counties.  The respondents were limited to persons who had actually shopped in the Boaz/Guntersville area during the preceding year."

1) There was strong and favorable familiarity with Boaz as a shopping area;[33]
2) Big Lots was extremely well known to the respondents, and favorably known – second only to Wal-Mart.[34]
3) Little Lots was nowhere near as well known or as favorably known, but a substantial segment of the respondents were familiar with it.[35]
4) 34% of the respondents thought Little Lots was connected with Big Lots in some way – an extraordinarily high percentage in comparison with case law precedents finding a likelihood of confusion.[36]
5) The respondents correctly assessed the type of merchandise that would be sold at a Little Lots store.[37]
6) Words such as "little" tended strongly to suggest their opposites (such as "big") to respondents.[38]

Big Lots also asserts the following: likely shoppers in the Boaz area had "an extraordinarily high impression" that Big Lots and Little Lots were connected; these impressions were not based

_____

[33] Respondents were very familiar with Boaz as a shopping venue, with 91% stating that they either had a favorable or very favorable impression, and only 4% not recognizing the Boaz shopping area or just recognizing but being unable to rate it. A sizeable majority were familiar with Guntersville and 59% had either a favorable or very favorable impression. 27% did not recognize the Guntersville area or just recognized but could not rate it.

[34] 74% of respondents had a favorable or very favorable impression of Big Lots, and only 22% did not recognize Big Lots or just recognized but could not rate Big Lots. 5% did not recognize Big Lots.

[35] 44% were favorably or very favorable impressed with Little Lots, although 49% did not recognize Little Lots or just recognized but could not rate Little Lots. 26% did not recognize Little Lots.

[36] According to plaintiffs, the survey showed that 67% of respondents thought there was a connection or were uncertain whether there was a connection. According to Big Lots, uncertainty creates confusion, and these percentages provide strong evidence of likelihood of confusion. *See J&J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460 (Fed. Cir. 1991)(30% confused respondents supports finding of likelihood of confusion).

[37] Percentages in excess of 70% correctly said Little Lots carried factory seconds or discontinued, damaged, distressed, or out-of-date merchandise. Very few (10%) thought fine jewelry could be purchased there. 40% thought they might find appliances there. Plaintiffs argue that the latter figure probably reflects that Little Lots sells small appliances but has not yet sold large appliances.

Walker testified that he does not carry out-of-date merchandise.

[38] When the word "little" was read to respondents, 58% of them said the first other word that came to mind was "big," and only 16% first thought of a synonym. A similar pattern was found to exist for other words with opposites, such as young, wet, off, and bad. Only where a word had no opposite, as with "trapeze" and "ceremony," did a different result occur.

16

on guesswork, since the respondents were highly familiar with both stores and specifically aware of the type of merchandise the stores carried; the use of opposites "are precisely the ones most likely to create confusion;"[39] and specific instances of actual confusion in the record reinforce the survey results.[40]

Furthermore, Big Lots argues, the fact that 34% of the survey respondents thought Little Lots was connected to Big Lots in some way provides strong evidence of likelihood of confusion. *See J&J Snack Foods Corp.*, 932 F.2d at 1460; *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325 (7th Cir. 1977)(29% relied upon to affirm preliminary injunction); *Berkshire Fashions, Inc. v. Sara Lee Corp.*, 729 F. Supp. 21 (28% supported finding of likelihood of confusion); *McDonald's Corp. v. McBagels, Inc.*, 649 F. Supp. 1268 (S.D.N.Y. 1986)(25% supported likelihood of confusion).[41] Here, Big Lots emphasizes, 34% of the respondents affirmatively indicated that they believed a connection existed between Little Lots and Big Lots, with 33% uncertain about any connection. Big Lots construes this evidence as follows: "34% were actually confused, and another 33% were on the fence and thus open to the suggestion that Big Lots and Little Lots were connected. Hence, an overwhelming 67% of the respondents incorrectly thought there was a connection or were uncertain as to a connection."[42] These results are particularly probative, Big Lots argues, because

---

[39] Big Lots asserts: "'Big' and 'little' are paired in the human mind in such a way that when one such word is mentioned, the other word is immediately suggested and brought to mind. Far from ameliorating possible confusion, the use of an 'opposite' magnifies and exacerbates the confusion."

[40] These survey results have been discussed earlier in this Findings of Fact and Conclusions of Law.

[41] Big Lots highlights other cases in which survey results showing smaller numbers of confused respondents still supported findings of likelihood of confusion. *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058 (2d Cir. 1979)(15-20% rate); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 297 (8th Cir. 1987)(10-12%); *Copy Cop v. Task Printing*, 908 F. Supp. 37 (D. Mass. 1995)(16.5%).

[42] Big Lots relies upon *A.T. Cross Company v. TPM Distributing, Incorporated*, 1995 WL 72660 (D. Minn. 1985)(finding 43% and 34% results were entitled to "great weight" and prove "actual confusion" as well as "strong likelihood of confusion").

of respondents' "high awareness of both the Big Lots and Little Lots stores."[43]

### C.    Marks Which Are "Opposites" Often Cause the Greatest Confusion

Big Lots asserts: "[M]arks with diametrically opposite meanings are the most confusingly similar of all." Plaintiff relies upon Dr. Hickson's report and conclusion (set out above). Big Lots also provides a chart representing cases where opposite or sharply contrasting marks (especially where the same type of business was involved) constituted infringement or dilution. *See, e.g., Mossler v. Jacobs*, 1896 WL 2616 (Ill. App. 1896)(for two tailoring businesses, priority mark was Six Little Tailors and confusingly similar mark was Six Big Tailors); *Downtowner Corp. v. Uptowner Inns, Inc.*, 178 U.S.P.Q. 105 (TTAB 1973)(for two motors inns/restaurants, priority mark was Downtowner and confusingly similar mark was Uptowner); *Toys "R" Us, Inc. v. Akkaoui*, U.S.P.Q. 1836 (N.D. Ca. 1996)(for children's items/adult internet site, Kids "R" Us was priority mark and Adults "R" Us was confusingly similar mark); *National Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co.*, 362 F.2d 374 (5th Cir. 1966)(for two insurance companies, priority mark was Blue Shield and confusingly similar mark was Red Shield). The court has fully considered plaintiffs' chart, entitled "Caselaw Precedents Involving Trademarks with Some Like Elements and Some Contrasting Elements," without recreating it here.

### D.    The Big Picture Shows Infringement[44]

Big Lots presents a map of the nine Big Lots stores surrounding Boaz, which appeared "before defendant Walker ever opened his store there." Big Lots notes that the Gadsden, Huntsville, and Cullman stores opened in 1989, and stores in Guntersville, Athens, Fort Payne, and Decatur were added by 1998.[45]   Plaintiffs argue:

> Clearly, Walker knew about Big Lots, had shopped at Big Lots, was surrounded

---

[43] These facts have been discussed earlier in this Findings of Fact and Conclusions of Law.

[44] This court does not repeat facts already noted in this Findings of Fact and Conclusions of Law.

[45] Big Lots points out that an earlier Decatur store opened in 1988.

by Big Lots stores throughout the area, picked a location right in the middle of a ring of Big Lots stores, picked a merchandising concept identical to Big Lots' focus on closeout and discount goods, and chose a name which obviously was suggestive of the Big Lots name.

There can be no reasonable doubt from the objective facts that Walker acted with singleness of purpose to try to ride the goodwill embodied in one of the nation's best known merchandising brands - Big Lots – and one of the best known in the six-county area around Boaz. He copied Big Lots' method of doing business, pursued the same customers and strategically chose a name and location calculated to create confusion from which he could benefit. The Powell survey shows that he has been extremely successful in creating the confusion he was counting on. Big Lots has been harmed by Walker's misappropriation of its name and goodwill, with the inevitable tarnishment effected by poor quality and Walker's trafficking in stolen goods.

E.   **The Remaining Likelihood of Confusion Factors Favor Big Lots and Corroborate the Likelihood of Confusion**

According to Big Lots, the BIG LOTS mark and registration are strong, "suggestive" marks.[46] The Big Lots name is used to identify retail store services offered by the company and suggests cheap prices.[47] Big Lots argues that its status as a "suggestive" mark places BIG LOTS mark in the category of the strong suggestive or arbitrary grouping of marks, which are "inherently distinctive," i.e., protected as trademarks without a showing of acquired distinctiveness. As inherently distinctive, Big Lots argues, "suggestive marks exist on the 'strong' side of the chasm

---

[46] "'Suggestive' terms suggest characteristics of the goods and services and 'require an effort of the imagination by the consumer in order to be understood as descriptive.'" *Dieter v. B & H Indus. of Southwest Florida, Inc.*, 880 F.2d 322, 327 (11th Cir. 1989)(quotation omitted).

This court's November 2002 order concluded:

> At the most, the BIG LOTS Marks, and in particular, the BIG LOTS Registration, are suggestive marks, as they suggest characteristics of the retail store services offered by plaintiffs. The marks may very well both be descriptive. The terms "Big" and "Lots" describe the quantitative nature of the products sold. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 (11th Cir. 1983). FN 1 It may be that the registration belies a descriptive designation. In any event, the court does not find that the Big Lots name is "strong" other than to the extent such strength may be provided by an incontestable registration.

[47] Big Lots mentions this court's observation at the 2002 preliminary injunction hearing: "THE COURT: You're a merchandiser. Does the idea that somebody buys in Big Lots, does that *suggest* that perhaps they're getting it cheaper? THE WITNESS [Mr. Walker]: Like I would imagine, they would think that." (Emphasis added).

separating inherently distinctive marks from 'weak' descriptive marks."[48]

The fact that the BIG LOTS registration is incontestable, plaintiff asserts, creates the presumption of a strong mark. *See Alltel Corp. v. Actel Integrated Communications, Inc.*, 42 F. Supp. 2d 1265, 1270 (S.D. Ala. 1999)("An incontestable mark is 'presumed to be . . . a relatively strong mark.'")(citation omitted); *Citicasters Licenses, Inc. v. Cumulus Media, Inc.*, 189 F. Supp. 2d 1372, 1377 (S.D. Ga. 2002)(same).  Importantly, Big Lots argues, the Powell survey showed BIG LOTS to be an extremely strong mark because it found a recognition level of 95% and a favorable or very favorable impression of 74%.

Big Lots then addresses the remaining likelihood of confusion factors.  There is similarity between the marks, Big Lots contends, as noted in the court's November 2002 Findings of Fact and Conclusions of Law.  Considering "the overall impression created by the marks as a whole" and "a comparison of the appearance, sound, and meaning of the marks, as well as the manner in which they are used,"[49] Big Lots argues, there is substantial similarity in overall impression here, as evidenced by both Dr. Hickson's and Dr. Powell's reports and declarations.[50]

Addressing the next three factors – similarity between the products and services, similarity of sales methods, and similarity of advertising methods – Big Lots contends that the similarities are "compelling."  Regarding products and services, Big Lots repeats evidence that both parties offer

_____

[48] Big Lots relies upon the following cases: *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992)(suggestive marks are inherently distinctive without a showing of secondary meaning); *Coach House Rest. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1559-60 (11th Cir. 1991)(same); *In re Great Lakes Canning, Inc.*, 227 U.S.P.Q. 483, 486 (T.T.A.B. 1985)(that a mark may be somewhat suggestive does not mean it is a "weak" mark entitled to a limited scope of protection).

[49] *See Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F. 2d 1502, 1506 (11th Cir. 1985).

[50] Again, Big Lots argues, people's tendencies to provide patterned responses to stimulus words that are opposites to the stimulus word have been demonstrated in theory by Dr. Hickson's research and in practice by Dr. Powell's survey.

Big Lots reiterates the substantial similarity in display, "as both parties display their marks prominently on the front of their retail stores, and on smocks, badges, shirts, or other items worn by employees in the stores, and in advertising."

retail store services involving the sale of a variety of goods at closeout prices.[51]  As for sales methods, Bit Lots notes, both parties operate closeout retail stores selling a variety of goods.[52] Moreover, Big Lots contends, the parties' advertising methods are similar, as both use local newspapers.  It is not necessary to show identical advertising or identical periodicals, plaintiffs assert, because similarity stems from advertising in the same general types of media.  *See Frehling*, 192 F.3d at 1339-40.[53]

"[While] Walker essentially has taken the position throughout this litigation that these similarities should be discounted due to the obvious lack of quality of Walker's Little Lots stores, its goods, and advertising," plaintiff argues, those facts are instead the most compelling evidence of harm to Big Lots and its mark.  According to Big Lots, the infringer's poor quality is relevant to show tarnishment of, depreciation of, or damage to the senior user's goodwill.  Such tarnishment exists, Big Lots contends, and references to Walker in some of his advertising has not alleviated the confusion.  Additionally, Big Lots asserts, evidence of Walker's intent to capitalize upon favorable associations with the BIG LOTS mark cannot be denied.[54]  While there is evidence of bad intent, Big Lots contends, such evidence is not necessary to determine likelihood of confusion.[55]

---

[51] The relevant test in this regard is "not whether the goods could be distinguished . . . but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods."  *See Frehling Enterprises, Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1338 (11th Cir. 1999).

[52]  This factor, Big Lots argues, weighs in favor of a finding of likelihood of confusion.  *See AmBrit*, 812 F.2d at 1542-43 (finding likelihood of confusion where "the products are both sold through the same channels, primarily supermarkets and convenience stores, to the same purchasers.").

[53] Big Lots asserts: "Indeed, the advertising would tend to distinguish marks only if entirely separate classes of customers are targeted.  Here the target customers are all local consumers."

[54] Big Lots repeats facts stated earlier regarding Walker's intent, including Walker's failure to consult an attorney or to conduct a trademark search prior to using the name "Little Lots."

[55] *See Jellibeans, Inc. v. Skating Clubs of Ga, Inc.*, 716 F.2d 833, 844 (11th Cir. 1983).  Big Lots also relies upon *Fuji Photo Film Co. v. Shinohara Shoji*, 754 F.2d 591, 596 (5th Cir. 1985)("The reason for this is clear: if potential purchasers are confused, no amount of good faith can make them less so.")

Big Lots repeats the Powell survey results, accuses Walker of purposefully choosing the name "Little Lots," and contends that "customers have been confused, they still are confused, and the potential for still further confusion is a reality." Plaintiffs conclude: "Federal registrations of trademarks, and incontestability once they have stood the test of time, are intended to provide a mechanism to prevent or put an end to such conditions, for the benefit of the public and for the furtherance of free and honest competition. Relief is badly needed, and Big Lots respectfully asks the Court to render such relief at the earliest possible time."

## II.   Defendant's Response[56]

### A.   Introduction

Defendants deem this court's previous determination of "absolutely no likelihood of confusion by people who see the stores, their layouts and their products" a "stake in the heart of Plaintiff's claims." Defendants argue that plaintiffs' assertions regarding likelihood of confusion are "based solely on a telephone survey conducted by plaintiffs, during which participants associated the words 'big' and 'little,' devoid of context, with no opportunity to compare the visual images of the parties' marks or to compare the stores, their layouts and their products." As such, defendants contend, plaintiffs have not countered the fact that any reasonable person who actually enters the stores would not be confused.

According to defendants, Big Lots's heavy reliance on the survey ignores controlling law requiring this court to "take into consideration the circumstances surrounding each particular case," including an analysis of the seven factors. *See Lone Star Steakhouse & Saloon, Inc., v. Lone Star Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997). Furthermore, in determining whether likelihood of confusion exists, "a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given each of these factors varies with the circumstances of the case." *AmBrit, Inc., v. Kraft, Inc.*, 812 F.2d

---

[56] Defendants incorporate by reference all the arguments and evidence from their motion for summary judgment. *See infra.*

1531, 1538 (11th Cir. 1986).  To the extent the Powell survey provides any evidence of actual confusion, Walker argues, such evidence is clearly outweighed by the totality of circumstances.

**B.**    **Arguments**

   **1.**    **The Survey Should Be Disregarded**[57]

In trademark infringement cases, defendants assert, the Eleventh Circuit gives little weight to survey evidence, particular from surveys (such as Powell's) which are mere "word association" tests.  *See Frehling* at 1341 n. 5 ("This Circuit, however, has moved away from relying on survey evidence");[58] *Holiday Inns, Inc. v. Holiday Out in America, Inc.*, 481 F.2d 445 (5th Cir. 1973)("In this case the trial court found that the survey degenerated into a mere word-association test entitled to little weight because the format failed to account for the number of responses attributable to the use of the word 'Holiday' as distinguished from the service mark 'Holiday Out.'")

   **A.**    **The Survey Was Nothing But a Word Association Test.**

According to defendants, this Circuit has rejected the use of "word association" tests in likelihood of confusion cases:

> Of additional concern, plaintiff's survey was a 'word association' test. Participants in the survey were confronted with the "Domino's Pizza" mark, and more or less asked if it brought anything else to mind. We have previously held that such a procedure degenerates 'into a word-association test entitled to little weight.' Holiday Inns, Inc. v. Holiday Out in America, 481 F.2d 445, 448 (5th Cir. 1973). We do not believe the Haley survey presents any meaningful evidence of likelihood of confusion.

*See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980).  Plaintiffs' supporting cases were not from this circuit, defendants argue.  In *Holiday Inns*, defendants note,

---

[57] For further discussions of alleged survey flaws, *see infra*.

[58] Big Lots distinguishes *Frehling* as involving different considerations.  The *Frehling* defendant sought a presumption in its favor based on its opposition's failure to provide survey evidence of actual confusion.  In responding to this argument, Big Lots contends, the Eleventh Circuit indicated that it no longer considered surveys to be indispensable, stating that "the failure to adduce such evidence is not damaging to the plaintiff's case" and noting that the district court had not found the absence of a survey to be "dispositive."

this Circuit specifically rejected word association tests involving opposites:

> Plaintiff relies heavily upon the testimony of a noted lexicographer that the words "in" and "out" are intertwined in their meanings, so that one is normally defined with respect to the other. The contention is that a person seeing or hearing the word "out" will echo in his mind the word "in," which is pronounced the same as "inn." <u>Thus, it is asserted that a person seeing the words "Holiday Out" will think of the words "Holiday Inn."</u> However, the lexicographer's testimony clearly shows that the context of the words must be considered and that the word "out" would not necessarily invoke the word "in" except in certain contexts. <u>The trial court correctly found that the manner of advertising and use of the defendants' marks would not be likely to cause a prospective customer to conclude that the defendants were in any way affiliated or connected with plaintiff.</u>

*Holiday Inns*, 481 F.2d at 448 (emphasis added).  Based on the foregoing, defendants argue:

"The plaintiffs' survey establishes nothing more than that the words themselves provoke a

predictable response in a portion of the people asked to play the game."

### B.    The Survey Was Misleading.

Defendants deem the Powell survey's key question a leading one designed to elicit a

certain response on the likelihood of confusion issue.  According to defendants, such a survey

question cannot be a true indicator of the likelihood of consumer confusion.  *See Universal City*

*Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 119 (2d Cir. 1984)(rejecting survey which

proffered the question "To the best of your knowledge, was the Donkey Kong name made with

the approval or under the authority of the people who produce the King Kong movies?")  The

*Universal City* court continued:  "[T]he above-mentioned inquiry was an obvious leading

question in that it suggested its own answer.  The participants were presented with the Donkey

Kong-King Kong connection rather than permitted to make their own associations."[59]

---

[59] Big Lots deems Walker's reliance on *Universal* "totally off-base," contending that the *Universal* court's disapproval of the relevant question had nothing to do with it being "leading." Rather, Big Lots argues, the disapproval was based upon unfair misinformation embedded in the question, which implied Universal Studios owned rights to the King Kong films.  To that effect, the court stated: "The question is unfair because Universal does not claim any ownership rights in the 1933 or 1976 King Kong films . . . .  The survey question apparently was a transparent attempt to raise an image which Universal does not own in the minds of the respondents . . . ." Additionally, there were other reasons (not related to the instant case) proffered for rejecting the survey.

Defendants also deem *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 450 (S.D.N.Y. 1982) on point. There, the question "Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" was found to elicit an influenced response. The court held:

> The survey establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assumption that, in the absence any other information, two companies with similar names are likely to have a business connection. However, this proposition provides no indication of public reaction under actual market conditions and we conclude that there is no meaningful evidence of actual confusion.

*Id.* at 451.[60] According to defendants, the same is true of the Powell survey's key question: "[W]ould you say the store known as "Little Lots" is connected with Big Lots in some way, or not connected with Big Lots in any way?"

Defendants criticize Big Lots's contention that the fact 33% of the respondents stated they had "no opinion" or were "unsure" about a connection between the parties evidences likelihood of confusion. Instead, defendants argue, this survey result "simply shows that one-third (1/3) of the people questioned, when presented with the names of the two stores and no additional information, would not make a guess as to whether the stores were or were not connected."[61] Turning to Big Lots's contention that 33% unsure results shows respondents

---

However, this court notes, the Second Circuit did criticize the leading nature of the survey question.

[60] The *Beneficial* court continued:

> Finally, the survey, in which random consumers and small businesses were selected from the telephone book, cannot be credited as a survey of "consumer reaction to the products under actual market conditions," *Information Clearing House, supra,* 492 F. Supp. at 160, because when faced with the prospect of borrowing money from either plaintiffs or defendant, a consumer or business would necessarily know more about the company than the minimal information provided to the survey respondents: the name of the companies.

[61] Walker distinguishes the *A.T. Cross* case relied upon by plaintiffs on the grounds that no evidence existed regarding consumers who responded "no opinion" or "unsure," and the survey respondents in *A.T. Cross* were shown models of the products made by the two companies.

"open to the suggestion that Big Lots and Little Lots were connected," defendants argue:

> That statement hits the nail on the head regarding what plaintiffs' survey actually
> proves: That when verbally asked a leading question suggesting that there may
> be a connection between two stores and given no additional information, people
> are "open to the suggestion" that the stores are connected. The survey proves
> nothing about actual confusion among people who see the stores, their layouts
> and their products.

Finally, defendants contend, the two-thirds of the participants who "failed to fall into the

trap" of the leading question present strong evidence of no confusion. *See Riviana Foods, Inc. v.*

*Societe Des Produits Nestle, S.A.*, 1994 U.S. Dist. LEXIS 20267, at * 10 (S.D. Tex. Dec. 20,

1994). In *Riviana*, the court rejected evidence of a telephone survey which asked: "Do you think

the weight loss product "Sweet Success" and "Success Rice" are more likely made by the same

company or more likely made by different companies?" because the question created an

association between two products where none may have existed previously. The *Riviana* court

held: "[T]he failure of 75% of those questioned to follow the leading suggestion and answer that

the products were made by the same company is strong evidence that there is no confusion." *Id.*

at * 10. The Powell survey does the same thing, defendants contend, and is therefore useless.

### C.   The Survey Did Not Represent the Opinions of the Appropriate Consumers.

The universe of respondents to a survey must be appropriate, i.e., "include a fair

sampling of those consumers likely to partake in the alleged infringer's goods or services," and

the interviewees must adequately represent the opinions which are relevant to the litigation. *See*

*Amstar* at 264 (discounting survey results in absence of proper universe).[62]  To be valid,

---

[62] Regarding the appropriate universe of survey respondents, the *Amstar* court stated:

> Of the ten cities in which the Haley survey was conducted, eight had no
> "Domino's Pizza" outlets, and the outlets in the remaining two had been open for
> less than three months.  Additionally, the persons interviewed consisted entirely
> of women found at home during six daylight hours who identified themselves as
> the member of the household primarily responsible for grocery buying.  As
> plaintiff's sugar is sold primarily in grocery stores, participants in the Haley
> survey would have been repeatedly exposed to plaintiff's mark,
> but would have had little, if any, exposure to defendants' mark.  Furthermore, the

defendants argue, a survey must rely on responses by potential customers of the stores in question.

For the Powell survey, defendants argue, those requirements were not met, and plaintiffs' contention that survey respondents were familiar with Little Lots is  incorrect and/or misleading. Noting the threshold question whether "you <u>or a member of your family</u>" (emphasis added) had shopped in Boaz or Guntersville in the past year, defendants assert, a respondent may never have shopped in those areas or its stores.  Further, the survey failed to inquire whether respondents had ever shopped in the Little Lots store, seen it, heard of it, or had any interest in shopping there.

When asked to rate the Big Lots and Little Lots store as places to shop using the categories "very favorable," "somewhat favorable," "somewhat unfavorable," "just recognize but cannot rate," or "do not recognize," defendants note, 49% of the respondents did not recognize or just recognized but could not rate the Little Lots store.  Further, defendants contend: "Out of the 34% of the participants who followed the survey's leading question and responded that a store known as 'Little Lots' would be connected with Big Lots in some way, <u>half</u> of <u>those</u> were people who also said they <u>could not rate or had never even heard of the Little Lots store</u>." Thus, any "confusion" demonstrated by the survey was based solely on reactions to the names of the stores, not the stores themselves.

### D.    <u>Telephone Surveys Are Ineffective in a Trademark Case.</u>

Defendants observe that telephone surveys prevent participants from seeing aspects critical to likelihood of confusion analysis, e.g., the visual image of the mark and its usage, or the product (in this case, the stores).  *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992)("The fact that the survey was conducted by telephone further diminishes its value.");

---

survey neglected completely defendants' primary customers: young, single, male college students.  Thus, we do not believe that the proper universe was examined, and the results of the survey must therefore be discounted.

*Riviana Foods, Inc.* ("Plaintiff's Success survey was conducted by telephone. As a result, the subject was unable to see the packaging which is an important aspect of the similarity of design factor of a likelihood of confusion analysis. This was an ineffective method to conduct the survey."); *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 393 (S.D.N.Y. 1985)("It is obvious, however, that when the inquiry is limited to a telephone survey, significant stimuli are eliminated. The respondents in the telephone survey are responding only to aural stimuli; in layman's language, to the sounds of the names.")

### 2.    Application of the Remaining Factors[63]

#### A.    BIG LOTS is not a strong mark (and thus entitled to less trademark protection)

Defendants remind the court of its previous determination that "BIG LOTS" is not a strong mark.[64] Defendants support this conclusion by evidence from Big Lots's Annual Reports and statements on its website. *See* Exhibits I & J. In its Annual Reports, Big Lots stated: "While we are a national retailer with nearly 1,400 stores, our brand awareness is still quite low . . . . We look forward to dramatically increasing public awareness of the Big Lots brand during 2003." Similarly, the 2000 Annual Report stated: "Although we are the nation's largest broad line closeout retailer, we are still a relative secret among investors, customers, and the media."

"The ultimate strength of a mark . . . is determined by a number of factors which establish its standing in the marketplace." *Sun Banks v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311, 315 (5th Cir. July 20, 1981). Defendants emphasize the following statements from Big Lots's website: "[O]nly about 15 percent of the nation recognizes the Big Lots name, compared to a 90% recognition rate for Wal-Mart" (Big Lots CEO Michael Potter); "We're a young

---

[63] Defendants accuse Big Lots of "glossing over" the remaining factors and failing to acknowledge or to offer new evidence to rebut the court's previous determination of "absolutely no likelihood of confusion by people who see, the stores, their layouts and their products."

[64] In its November 2002 Findings of Fact and Conclusions of Law, this court concluded: "The court is not prepared to hold, at this stage, that BIG LOTS is a strong mark."

business in terms of brand. We have changed our name. And we're relatively unknown. We have about 15 percent name recognition with customers" (same); "We've been a well-kept secret, but we can move ourselves up in the market" (Executive Vice President of Sales Promotion Kent Larsson).

In addition to these admissions, defendants contend, the BIG LOTS mark is also weak based on the large number of third parties doing business under similar names. *See Frehling*, 192 F.3d at 1336 ("Also important in gauging the strength of a mark is the degree to which third parties make use of the mark"); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973-74 (11th Cir. 1983)(when considering "Memory Stub" Mark, noting "[A] strong trademark is one that is rarely used by other parties."); *Sun Banks*, 615 F.2d at 316 ("[W]e find the extensive third-party use of the word "Sun" impressive evidence that there would be no likelihood of confusion between Sun Banks and Sun Federal.") Defendants rely upon the third-party usage brief and statements from this court's November 2002 Findings of Fact and Conclusions of Law.[65]

## B.  The Appearance of the Marks is not Similar.

Relying upon *Exxon Corporation v. Texas Motor Exchange*, 628 F.2d 500, 504 (5th Cir. 1980)("This factor has been described as 'really nothing more than a subjective 'eyeball' test'"), defendants contend, a comparison of the visual image of the marks is important in this analysis.

---

[65] In its November 2002 Findings of Fact and Conclusions of Law, this court noted the use of the word "lots" in business entities including "Odd Lots," "Job Lots," "Tot Lots," "Case Lots," "Custom Lots," "Mix-a-Lots," "Bargain Lots," "Stock Lots," "Food Lots," "Mini Lots," "Scattered Lots," and "Unique Lots."

This court also stated:

> [A]ll the words in both business names are in widespread use. This includes 'big', 'little,' and 'lots.'" Furthermore, "The word 'lots' is likewise descriptive and in widespread use . . . . When the court uses the term descriptive, it does so, not necessarily as a term of art because the plaintiffs seem to suggest that such a finding by the court cannot be legally made. The court does feel that the nature of the terms, separately and combined, has a bearing on their strength.

*See Reeves v. Motley Crue, Inc.*, 1991 U.S. Dist. LEXIS 19379 (N.D. Ala. 1991)("The Dr. Feelgood marks used by the two parties sound exactly alike. They are spelled the same. However, both marks have a distinctive style . . . . Taken as a whole, the marks do not seem to be similar to the viewer."). Here, defendants argue, the colors and print styles of the marks have been shown to be significantly different as used in the parties' storefronts, advertising, and other signs.

According to Walker, Hickson's expert analysis, i.e., "people tend overwhelmingly to provide patterned responses to stimulus words that are opposites,"[66] is not useful. Defendants agree that the court must take into account "the overall impression created by the marks as a whole" plus "a comparison of the appearance, sound, and meaning of the marks, as well as the manner in which they are used."[67] When assessed with the "eyeball" test, defendants assert, the marks are dissimilar.

For instance, the BIG LOTS mark: uses an orange exclamation mark (!);[68] appears in color print advertising using custom typeset capital letters in black or orange print; often presents the word "BIG" on top of "LOTS!" in print advertising; and uses the qualifier "THE CLOSEOUT STORE" in conjunction with BIG LOTS mark at the Guntersville store. On the contrary, the Little Lots mark: appears in standard block print in red on its storefront and billboards and in black and white when used in print advertising; places the words side by side; and on billboards is accompanied by the slogan "Tony Says Good Stuff Great Prices" (also in red letters). Defendants argue: "While the words themselves may bring about a mental

---

[66] Defendants contend that this only requires common sense, not expert testimony.

[67] *See Ross Bicycles* at 1507 (finding no likelihood of confusion between plaintiff's "Ross Diamond Cruiser" bicycle and defendant's "Boss Cruiser" bicycle). The November 2002 Findings of Fact and Conclusions of Law stated: "The similarities here are probably not as confusing as the similarities between a 'Ross' bicycle cruiser and a 'Boss' bicycle cruiser."

[68] The exclamation point is used in all of Big Lots's window advertising, price tagging, and other signs.

comparison because of the opposite terms, the manner in which the marks are displayed, particularly the contrast in color and style, demonstrates that the visual images of the marks are not similar."

        **C.**      **The Services Offered by the Parties are not Similar.**[69]

        **D.**      **The Parties Sales Methods are not Similar.**[70]

        **E.**      **The Parties' Advertising Methods are Distinguishable.**

      Defendants rely on this court's previous findings and argue that Little Lots's local advertising is distinguishable from Big Lots's advertising nationally on television (with celebrities), in print (using professionally prepared color inserts in high-circulation newspapers), and on their website.[71] Defendants also emphasize Big Lots's 2002 Annual Report, which indicated that Big Lots has embarked on a nationwide television ad campaign to increase their name recognition.[72] While both parties use newspaper ads, defendants argue, this fact does not support a finding of likelihood of confusion in light of "extreme differences in form, color, and layout, and the weakness of the BIG LOTS mark."[73] In fact, defendants argue, they have reduced their advertising since the preliminary injunction stage, while Big Lots has enhanced its national television advertising.

---

[69] Defendants rely on this court's November 2002 Findings of Fact and Conclusions of Law.

[70] Defendants rely on this court's November 2002 Findings of Fact and Conclusions of Law.

[71] Facts pertaining to the parties' advertising methods have already been addressed.

[72] Specifically, the Report stated: "While we are a national retailer with nearly 1,400 stores, our brand awareness is still quite low. During 2003, we will launch a national advertising campaign to communicate our branded deals and great prices."

[73] *See Sun Banks*, 651 F.2d at 318 (holding that media similarity "insufficient to sustain a finding of likelihood of confusion in light of the restricted range of protection to which Sun Banks' weak mark is entitled."); *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985)(affirming conclusion that the overall ad campaigns of the two entities was "quite different," considering Freedom Savings's more extensive advertising spending primarily on television, radio, and high-circulation newspapers versus Freedom Realty's infrequent radio, newsletter, "shopper" papers, and low-circulation newspaper ads).

**F.      There is No Evidence that Defendants Intended to Capitalize on the Big Lots Name.**

Defendants assert that plaintiffs have not produced evidence of intent, despite Walker's awareness of BIG LOTS when he opened his Little Lots store.  According to defendants, improper intent is not indicated by the defendants' mere adoption of the mark with knowledge of the plaintiff's mark, particularly considering the weakness of the plaintiff's mark.  *See El Chico, Inc. v. El Chico Café*, 214 F.2d 721, 726 (5th Cir. 1954)(upholding unlikelihood of confusion finding, even though at the time of the establishment of the defendants' business, defendants "had knowledge of the plaintiff's business" and "also knew that the phrase 'El Chico' was used on many other products.")

After relating facts about the "Little Lots" Cullman store and Walker's stated reason for using the name,[74] defendants also rely upon Walker's initial newspaper advertisement of Little Lots (indicating he owned it and associating Little Lots with the 50% Less and More Store) as "inconsistent with finding . . . the intent to have the public conclude that Little Lots was affiliated with Big Lots."  According to Walker, it did not occur to him in naming his store that people might see "Little Lots" and think "Big Lots."

**G.      Actual Confusion**

According to defendants, plaintiffs' only evidence of actual confusion is the flawed survey and the limited customer inquiries.  Quoting *Gruner + Jahr USA Publishing v. Meredith Corp.*, 793 F. Supp. 1222, 1232 (S.D.N.Y. 1992), defendants contend, "[S]aid evidence demonstrates only that certain persons thought to inquire as to whether or not a relationship between plaintiff and defendant existed, and not that such persons assumed that plaintiff and defendant were in any manner related."  *See also Sears Roebuck & Co. v. All States Life Ins. Co.*, 246 F.2d 161, 170 (5th Cir. 1957)("In each instance, however, they did no more than inquire as to

---

[74] Relevant facts have already been discussed.  Defendants highlight the photograph of the Cullman store submitted at the preliminary injunction hearing as Defendant's Exhibit 6, which depicted the sign "LITTLE is LOTS when there is a bargain in it."

whether there was any real connection . . . . The possibility of confusion certainly existed, but we believe it is permissible for the trial court to have rejected the contention that confusion was likely.").

Furthermore, defendants argue, few inquiries compared to the large number of customers indicate no likelihood of confusion in the minds of "an appreciable number of 'reasonably prudent' buyers." *See John H. Harland*, 711 F.2d at 979 n. 22 ("Infringement occurs when 'there is a likelihood of confusion in the mind[s] of an appreciable number of 'reasonably prudent buyers.'")[75] On numerous occasions, defendants assert, the Eleventh and former Fifth Circuits have found no likelihood of confusion sufficient to merit relief even where actual confusion exists.[76] Defendants contend: "In this case, plaintiffs' weak mark, the lack of similarity between the manner in which the parties' names are used, and the stark contrast between the stores themselves, virtually eliminate the impact of any actual confusion which might have occurred." Importantly, defendants emphasize, plaintiffs have not identified any

_____

[75] Defendants rely upon *Sun Banks*, 651 F.2d at 319 ("Although the record contains several isolated instances of uncertainty whether there was a connection between the two business, in light of the number of transactions conducted and the extent of the parties' advertising, the amount of past confusion is negligible.")

However, this court notes, *Sun Banks* further stated:

> The first indicia of confusion offered by Sun Banks came in response to a letter written by Sun Banks' president to all subsidiary banks requesting employee to report incidents of confusion stemming from Sun Federal's use of the word "Sun." In three years, less than fifteen such incidents were reported. Some of those involved relatives of Sun Banks' employees, while others could not be identified. Apparently none of the remarks was made by a potential customer considering whether to transact business with one or the other of the parties. Sun Banks also produced four witnesses who recounted having inquired whether Sun Banks and Sun Federal were related. Again in each instance there is no indication that the inquiry was made by a potential customer concerning the transaction of business.

[76] *See Sun Banks, supra* (after plaintiff provided evidence of less than fifteen instances of alleged actual confusion, stating: "the countervailing circumstances in this case . . . lessen significantly the impact of any actual confusion which might have occurred"); *Amstar, supra* ("isolated instances of actual confusion are insufficient to sustain a finding of likelihood of confusion); *Sears, supra.*

actual customers who will testify to being actually confused.

In conclusion, defendants again reference this court's prior Findings of Fact and Conclusions of Law and the Eleventh Circuit's affirmation of it.[77] Furthermore, defendants address plaintiff's allegations about Walker's criminal background.[78]

## III.    Plaintiff's Reply

### A.    The Survey Evidence is Admissible, Reliable and Unrebutted – And Shows a High Level of Actual Confusion

First, Big Lots asserts, defendants have stated that some survey respondents were individuals who either did not recognize "Little Lots" or who recognized "Little Lots" but could not rate it (based on the affidavit of defense counsel who examined the survey's raw data). Big Lots deems this argument "a red herring" "because the measurement of confusion does not change materially (in fact it goes up slightly) if either or both of the groups referenced by plaintiff are excluded, without any significant effect on reliability" and "because the results were reliable whether utilizing the entire 500-person sample or using subgroups within this sample."

Since the "residential household" is the proper sampling unit in this type of survey (as established by Dr. Powell), it was proper to interview the randomly selected respondents who

---

[77] This court notes that the Eleventh Circuit affirmed on only one limited factor.

[78] Specifically, defendants contend:

> In an attempt to divert the Court's attention, the Plaintiff's have needlessly inserted in their brief several embellished references to a misdemeanor charge of receiving stolen property to which Tony Walker entered a guilty plea in 1999. Such evidence is not even properly admissible because the charge was a misdemeanor and did not involve "dishonesty or false statement." Fed. R. Evid. 609. Nonetheless, the plaintiffs have attempted to prejudice the Court by misrepresenting that Walker has been "dealing in stolen goods" and "trafficking in stolen goods." The Court will find that the facts surrounding that charge are plainly set forth in Mr. Walker's deposition and do not bear repeating here because they are entirely irrelevant to the issues in this case. The fact that plaintiff have resorted to such tactics underscores that they recognize and comprehend the weakness of their case.

*See infra* pp. 78-79.

34

stated that they or a member of their family had shopped in the Boaz-Guntersville area during the past year.  Furthermore, Big Lots contends, the fact that very high percentages of the respondents were in fact familiar with specifically named stores in the Boaz-Guntersville area confirms the validity of the sampling pool.[79]

Moreover, plaintiffs contend, defendants falsely suggest that the respondents' answers merely reflected "word associations" as opposed to the "truth," i.e., that they reflect specific personal knowledge of the Boaz and Guntersville marketplaces.  Furthermore, Big Lots argue, word associations continue to play an important role in trademark litigation because trademarks are usually words.  According to Big Lots, the important distinction is between mere abstract word associations out of the  marketplace context (which are not alone always sufficient to establish likelihood of confusion) versus word associations in the marketplace context of knowledge of specific stores (which still play a critical role in trademark law and can be dispositive).  Here, Big Lots argues, "the critical question as to the connection of [the parties' stores] was predicated specifically upon the respondents' marketplace impressions."

While avowing the validity of the entire 500-person sample, Big Lots also analyzes the data without the subgroups criticized by Walker.  Applying Walker's contention – that the court should ignore all responses from individuals not specifically familiar with the "Little Lots" store[80] -- Big Lots asserts the following (based on Dr. Powell's declaration): 1) taking the 76% of respondents who were familiar with the Boaz-Guntersville marketplace and with both Big Lots and Little Lots, actual confusion in fact increases from 34% to 35%; 2)  even though the sample

---

[79] For example, Big Lots observes, nearly 100% were familiar with the Wal-Mart store, 95% were familiar with the Big Lots store, 91% were familiar with the Black and Decker store, 90% were familiar with the Reebok store, and 87% were familiar with the Ralph Lauren/Polo store. In fact, Big Lots argues, 3/4 of the respondents were personally familiar with the Little Lots store.

[80] If defendants' logic were employed, Big Lots contends, a consumer survey could never be conducted when an infringer first opened its doors, resulting in the infringer wreaking havoc in the marketplace until the infringer became well-known.

size decreases somewhat in that scenario, the 95% confidence level remains the same and the margin of error is just plus or minus 5.1% (compared with plus or minus 4.4% for the entire 500-person sample); 3) even excluding respondents who stated that they did recognize Little Lots but could not rate it as favorable or unfavorable,[81] the measured level of actual confusion remains at 35%, with a confidence level of 95% and the margin of error at plus or minus 6.1%.

These figures, Big Lots contends, consistently show a level of actual confusion of more than one-third of consumers, not to mention a large additional sector of respondents who were unsure whether there is a connection and thus provided "fertile ground for exploitation by Walker." Adding the documented instances of actual confusion from Walker's and Big Lots's patrons, Big Lots argues, there is admissible, reliable, and unrebutted evidence of more than mere "likelihood of confusion." According to Big Lots, the survey shows "the marketplace result of the composite of all the other factors the courts look to in a likelihood of confusion determination."

Big Lots deems *Amstar* and *Holiday Inns* (cited in *Amstar*) not only inapposite to Walker's contentions but also proof of the Powell survey's validity. In *Amstar*, Big Lots contends, the court held that a survey divorced from marketplace impressions was entitled to "little weight." *See* 615 F.2d at 264. Moreover, *Holiday Inn* involved a lexicographer's testimony – not a survey. There, the court noted that "the context of words must be considered," and that absent such a context "a mere word association test [was] entitled to little weight." The Powell survey provided such context, Big Lots argues, as noted in Dr. Powell's declaration:

> I also wish to re-emphasize that the confusion reflected in the survey
> results from questions and responses which <u>preceded</u> any questions
> which could be described as word association questions and was in
> no way influenced by such word association (or stimulus-response)
> questions. The latter questions were tacked onto the end of the survey
> where the preceding questions and answers had already measured the
> extent of confusion and were put there solely to provide data for

---

[81] Big Lots urges the court to consider this particular group of respondents, as they are familiar with Little Lots, Big Lots, and the Boaz-Guntersville marketplace.

Dr. Mark Hickson's report.  They were not a part of and had no bearing, influence or effect on the determination of *marketplace confusion.*

(Emphasis added).  According to plaintiffs, the respondents' familiarity with the Boaz-Guntersville marketplace and the stores therein provided the foundation for the "impressions" probed in the survey, and the critical question began with the words "Based on your <u>impressions</u> . . . ."

Plaintiffs argue that the Eleventh Circuit accepts proper surveys.  *See, e.g., Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11ᵗʰ Cir. 2002)(while "full-blown consumer surveys or market research are not absolute prerequisites," strong proof required in their absence); *Gift of Learning Foundation v. TGC, Inc.*, 329 F.3d 792, 799 (11ᵗʰ Cir. 2003)("TGC notes that Kids Golf has no consumer evidence survey.  However, such evidence is not required to prove secondary meaning . . . . In the absence of consumer survey evidence, the Eleventh Circuit considers four factors to determine whether a particular mark has acquired secondary meaning . . . .");[82] *Jellibeans* at 841 (11ᵗʰ Cir. 1983)(noting positively survey evidence which showed 96% of the respondents had heard of the Jellibeans skating rink); *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513-14 (11ᵗʰ Cir. 1984)(in determining whether name had acquired secondary meaning, court noted "market surveys revealed that the Singleton name was strongly identified with the products of Singleton Packing").

Plaintiffs dispute defendants' contention that the Powell survey's critical question was "leading" and thereby produced a misleading result.[83]  Further, Big Lots argues, defendants'

_____

[82] This statement, the court notes, appeared in the context of Lanham Act analysis of a false advertising claim.

[83] There is nothing misleading, plaintiffs argue, about

establishing a respondent's familiarity with the marketplace and with a considerable number of specific stores in the marketplace in an alphabetical listing, and then asking: "Based on your impressions, would you say the store known as 'Little Lots' is (1) connected with Big Lots in some way, or (2) not connected with Big Lots in any way?"  To take out any possibility that the order in which "(1)" and "(2)" were asked could bias the result, the order of these

37

reliance on *Beneficial* and *Riviana* is misplaced, since those surveys exhibited flaws specifically avoided by Dr. Powell. First, Big Lots asserts, the *Beneficial* survey suffered from a failure to establish the respondents' familiarity with the parties prior to asking the critical question, resulting in answers which amounted to speculation based solely on the common first word in each company's name. Additionally, Big Lots argues, the critical question was asked abstractly, not based on marketplace impressions growing out of marketplace familiarity.

Second, plaintiffs argue, *Riviana* in fact <u>supports</u> the Powell survey's methodology; there, the surveyor made the mistake Dr. Powell was allegedly careful to avoid, i.e., first inquiring as to whether two products were likely made by the same company and then, in subsequent questions, asking about the respondents' awareness of just those two products "and no others, thereby creating an association between the two products where none may have existed previously." *Id.* at 10. By contrast, Big Lots argues, Powell <u>first</u> asked about the respondents' familiarity with and impressions of many different area stores, carefully separating them so Little Lots and Big Lots were not juxtaposed. Only <u>after</u> these impressions were recorded, Big Lots contends, did the questionnaire ask the key question about connectivity.[84]

Finally, Big Lots asserts, defendants have argued erroneously that conducting the survey by telephone reduces its credibility because the respondents could not see the stores while being

---

subparts of the questions was alternated (accomplished automatically through the computer program), so that the "(2)" portion preceded the "(1)" portion half of the time. This is as clean and unbiased as it is possible to achieve.

Big Lots also notes that the options for that question were automatically rotated to avoid any bias, so that half the respondents were asked the questions in the reverse order, i.e., "not connected" was the option first given and "connected" was the second option.

[84] Big Lots adds: "Here, also, unimpeachable methodology was used: (1) the question specifically directed the respondents to base their answers on their actual impressions of Big Lots and Little Lots (as established by the earlier questions), whereas the *Riviana* survey had neither established the existence of any impressions at that point nor asked that the answers be based upon those impressions, rendering it purely abstract." Also, Big Lots asserts, the first series of questions regarding "impressions" were also rotated to avoid bias. In that series, Big Lots and Little Lots were "alphabetically sandwiched in among a total of nine stores which included neutral stores used to 'control purposes.'"

questioned. Ironically, Big Lots observes, showing the respondents pictures of the stores would have likely fostered an argument that such pictures biased the result in favor of the likelihood of confusion, since "(1) pictures of other stores were not shown to respondents,[85] and (2) likelihood of confusion is based upon a memory comparison of marks, not a side-by-side comparison."[86]

Addressing Walker's reliance on *Spraying Systems,*[87] *Inc, Publishing,*[88] and *Riviana Foods,*[89] Big Lots contends, these cases represent the "few instances where it is impossible to get optimal responses without visual aids." Big Lots argues that these cases did not generally condemn telephone surveys as ineffective; rather, these cases acknowledged that such surveys are not necessarily defective or inadmissible. Further, Big Lots asserts, the incontestable BIG LOTS mark is merely a two-word mark in block letters with no punctuation or other adornment.[90]

---

[85] According to Big Lots, the presentation of pictures of competing products provided a major element of bias in cases like *Riviana* and *Simon Property Group L.P. v. My Simon, Inc.,* 104 F. Supp. 2d 1033 (S.D. Ind. 2000).

[86] *See, e.g., Empire Guano Co. v. Jefferson Fertilizer Co.,* 78 So. 53 (Ala. 1918); *Brooks v. Great Atl. & Pac. Tea Co.,* 92 F.2d 794, 797 (9th Cir. 1937); *Nehi Corp. v. Mission Dry Corp.,* 117 F. Supp. 116 (D. Del. 1953).

[87] There, Big Lots contends, the survey was offered to prove "secondary meaning" in a trademark cancellation proceeding, not to prove trademark infringement. Furthermore, Big Lots argues: "The Court was primarily critical of certain two different sets of biases in the survey based on the manner in which key questions were asked. However, the Court also noted as a third factor that a critical element of the marks in that particular case was the use of a hyphen in a two-part mark, a feature which could not as readily be tested in a telephone survey as by means of visual aids."

[88] The *Inc. Publishing* court criticized the survey because of the particular questions asked, the use of too narrow a universe of respondents, the use of the word "might" in certain questions, the use of leading questions, and (in context) exclusive reliance on a telephone survey when the legal issues involved the appearance of two magazine covers (which could not be portrayed fully via telephone interviews). The court noted that "telephone surveys are not *per se* unreliable." *Id.* at 393.

[89] In *Riviana*, Big Lots argues, the particular shape and configuration of product packaging was a major issue not able to be adequately conveyed in a telephone survey.

[90] Defendants suggest that the exclamation point is part and parcel of the BIG LOTS Mark.

Where radio advertising is significant (as here, where Little Lots heavily utilizes local radio ads), Big Lots argues, telephone surveys are probably optimal. *See, e.g., McDonald's v. McBagel's* at 1278 ("Although the survey did not replicate the parties' print advertising, by soliciting audio responses it was closely related to the radio advertising involved in the case.") "Trademarks, like small children, are not only seen but heard." *Grotian, Hefferick, Schulz Th. Steinweg Nach. v. Steinway & Sons*, 533 F.2d 1331, 1340 (2d Cir. 1975); *see also Gen. Food Corp. v. Wisconsin Bottling, Inc.*, 190 U.S.P.Q. 43 (TTAB 1976). Furthermore, Big Lots emphasizes, Little Lots's Internet ad reaches local, national, and international consumers who cannot view either party's storefront.

Big Lots touts the alleged methodological advantages of telephone surveys,[91] i.e., assurance of unparalleled randomness, the minimization of external distractions, and the minimization of extraneous effects due to the interaction of surveyor and respondent. Big Lots reiterates the Powell survey's conclusions:

1. At least in the relevant counties in and around the Boaz-Guntersville shopping area, "BIG LOTS" is a very strong mark, familiar to 95% of consumers and with 74% of them having either a favorable or very favorable impression of the Big Lots operation.
2. A large number of consumers, in the 34%-35% range, are actually confused, having the impression that Big Lots and Little Lots are connected when in fact they are not. A large number of others are unsure as to whether there is a connection.
3. The surest way to create confusion is to choose a name which is opposite any other name. Consumers associate such "opposites" together more strongly than synonyms or any the opposite of a well-known existing business, as demonstrated by both the Powell and Hickson Declarations and Reports.

**B.    The Individual Factors Also Strongly Favor Big Lots**

      **1.    Big Lots Is an Extremely Strong Mark**

In the marketplace relevant to this litigation, Big Lots argues, the BIG LOTS mark is

---

[91] By Big Lots's account, telephone surveys are the most frequent type used. Big Lots knows of no case where a survey has been rejected solely because it was a telephone survey. Furthermore, Big Lots argues, there is neither "case law adverse to the general use of telephone surveys" nor "expert testimony in this case which criticizes telephone surveys."

extremely strong, enjoying both a 95% recognition factor (second only to Wal-Mart's 99% and better recognized that Black and Decker, Reebok, Ralph Lauren/Polo, Dollar Discount, Dress Barn, or K-B Toy liquidators) and favorably regarded by area consumers (with nearly three-quarters regarding it favorably or very favorably (close only to Wal-Mart)). Plaintiffs repeat facts about the Big Lots stores in Alabama and nationwide, their dates of inception, and advertising expenditures. Furthermore, Big Lots notes, the company had some 923 stores operating nationally under the BIG LOTS name as of March 2001. Additionally, Big Lots argues, all of the nine stores surrounding the Boaz area in northeast Alabama bore the BIG LOTS name from their inception.

Big Lots reiterates that its incontestable mark afford a presumption of strength. *See, e.g., Dieter v. B&H Indus. of S.W. Florida, Inc.,* 880 F.2d 322, 329 (11th Cir. 1989)("We hold that incontestable status is factor to be taken into consideration in likelihood of confusion analysis. Because Dieter's mark is incontestable, then it is presumed to be . . . a relatively strong mark."); *Alltel Corp.* at 1270 (*see supra*); *Citicasters* at 1377 (*see supra*). As a suggestive mark, Big Lots further argues, BIG LOTS falls into the category of marks deserving a "high level of trademark protection." *See, e.g., Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418, 426 and n.7 (2003).[92]

Since November 2002, Big Lots alleges, a number of important changes have occurred, of which the Powell survey is foremost. Big Lots asserts: "We have further clarified an ambiguity in the record that might have led the court to believe that BIG LOTS was a new name to which stores previously operating under different names were being converted. In fact, nearly 1000 stores had always operated under the BIG LOTS name, and only 368 additional stores were converted over to BIG LOTS in 2001 and 2002." Additionally, Big Lots observes, advertising expenditures in the seven-county area surrounding Boaz have averaged more than $500,000 annually. Finally, Big Lots moves to strike "facts" from the third-party usage brief on the

---

[92] The court observes that note 7 in *Moseley* specifically addresses arbitrary and fanciful marks as afforded a high level of protection.

grounds that such evidence is not relevant, admissible, or accurate.   In northeast Alabama, Big Lots observes, the BIG LOTS mark has been in continuous, exclusive use in nine different stores long before Little Lots opened.

### 2.   The Appearance of the Marks is Similar

The federally registered incontestable trademark BIG LOTS, plaintiffs contend, "is simply those two unadorned words." As such, neither the coloring of the words on the store front, the use of a exclamation point, or the certain style script limit the protection given to it under the Lanham Act.  The words "Little Lots" are similar to "Big Lots," plaintiffs argue, as manifested by the words themselves and Dr. Hickson's Declaration and Report.[93]  Noting this court's earlier finding of "some similarity between the marks BIG LOTS and LITTLE LOTS," Big Lots argues, the evidence is now far stronger considering the Hickson and Powell findings.[94]

### 3.   The Services Offered by the Parties Are Not Only Similar; They Are the Same

The lease on the building where Little Lots is located provides that the building is leased "solely for use as a retail store for the sale of any and all closeout and/or liquidated merchandise."  Plaintiffs contend that they are in precisely the same line of business and repeat the *Frehling* test for similarity of goods/services: "not whether the goods could be distinguished . . . but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods [or carry the same retail lines, in the case of retail services.]" Big Lots again highlights the Powell survey results.  Big Lots contends: "The critical thing in the instant case is that both businesses are retailers, and that within the retail category

---

[93] Big Lots argues: "Dr. Hickson expected based on classic studies done by scholars independent of this case that survey respondents would tend to provide patterned responses to stimulus words that are opposites to the stimulus words.  Of course, this is exactly what occurred in the survey."  This court notes that  Hickson's conclusion has already been discussed.

[94] Big Lots argues: "This market-based result shows the irrelevancy of other 'add-on' words and symbols, such as the exclamation point, and some of the so-called slogans and qualifiers used in connection with the specific stores.  In the real marketplace, the players are simply 'BIG LOTS' and 'LITTLE LOTS,' which consumers demonstrably find confusing and similar."

they are both in a narrow subcategory of the closeout/liquidation business (which is a very limited field.)"

### 4.    The Parties' Sales Methods are Identical

Big Lots points out that both businesses sell closeout/liquidation merchandise in large twenty-thousand-plus-square-foot buildings where merchandise is featured at heavily discounted prices.  This factor, Big Lots contends, does not require the stores to have equal neatness, cleanliness, or efficiency, just equivalent modes of selling.  According to Big Lots, "The factor basically involves an assessment of whether the same <u>channels</u> of distribution are used by both, considering such possible options as mail-order merchandising, door-to-door sales, custom manufacture, wholesale, drive-through, personal service versus mass merchandising, and other variations."[95]  Unquestionably, Big Lots argues, both businesses target the same customers, i.e., "those consumers who live in Marshall County and nearby areas who are looking for bargains from closeout/liquidation retailers."

### 5.    The Parties Use Similar Advertising Methods

Big Lots notes similarities in advertising, including print media advertising through newspapers, Internet advertising, and advertising through banners and other at-store means. According to Big Lots, the parties' stores target the same group of potential customers in the same geographic area.  According to Big Lots, the standard for this factor whether there is "likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result."  *See Frehling* at 1340.  Big Lots states: "The parties' common use of print media distributed to the same readership is alone sufficient to satisfy this factor."

### 6.    Walker Clearly Intended to Infringe Upon Big Lots' Goodwill and Trademark Rights

Big Lots argues that state of mind is "largely a one-sided factor," i.e., "a wrongful intent

---

[95] Again, Big Lots relies on *Ambrit, see supra.*

can be conclusive against an infringer, but good intent cannot save what is otherwise an objective infringement." *See Jellibeans* at 841; *Fuji Photo Film* at 596.  As evidence of Walker's wrongful intent, Big Lots repeats the following facts: (1) Walker knew of Big Lots at least as early as 1993 when he operated the weekend Cullman store; (2) Walker had shopped in a Big Lots store at least six years prior to his 2003 deposition, therefore five years before opening the Little Lots store; (3) Walker has shopped in at least two Big Lots stores in Guntersville and in Chattanooga, on at least six occasions; (4) Big Lots opened a Cullman store in 1988 and a Guntersville store in 1996; (5) Nine Big Lots stores in northeast Alabama all using the BIG LOTS name had opened years before Walker opened his Little Lots store; (6) Big Lots had spent more than $ 500,000 in local advertising (and even more in national advertising) during the four years preceding the opening of Little Lots; (7) Walker was operating a grocery store for about ten years just prior to opening Little Lots in Boaz, which he still operates; (8) Walker's previous employment history shows he had helped managed a dime store, a pet shop, a wholesale business, then operated several flea market stands on the weekends, then operated his grocery business; however, he had not operated a retail closeout/liquidation business before opening the Little Lots store; (9) Walker chose to open a retail closeout/liquidation store in Boaz, surrounded by nine pre-existing Big Lots stores in northeast Alabama, under the name "Little Lots"; (10) Walker neither consulted an attorney prior to choosing the "Little Lots" name nor conducted a trademark or name search; and (11) Walker was aware of Big Lots stores in Guntersville and Chattanooga before opening Little Lots in Boaz.

According to Big Lots, "the law presumes that persons intend the natural consequences of their actions."  To mitigate Walker's wrongful intent, Big Lots notes, defendants have relied upon the 1993-94 operation of a 500-square-foot flea market stand on weekends in Cullman, Alabama, whose name was "Country Village" but also bore a small homemade sign stating "Little Lots."  This fact does not help Walker, Big Lots argues, because (1) he was already aware of Big Lots stores (of which Cullman already had one), and (2) he was not operating a retail

closeout/liquidation business at the time.  Big Lots contends: "An infringer in 1993-94 does not become more innocent when he infringes on a larger scale in 2002-03 in a line closer to the trademark owner's line."[96]

### 7.    Actual Confusion Has Been Proved Beyond Any Reasonable Doubt and Has Been Proved Every Way It Is Possible to Prove It

Big Lots again references the customer inquiries as well as the Powell survey.  Big Lots asserts that very little actual confusion satisfies this factor.  Relying on *Jellibeans*, Big Lots contends, even two instances will suffice.  In upholding a finding of actual confusion involving only two patients and one business acquaintance of a shareholder of plaintiff, the Eleventh Circuit noted: "[T]he quantum of evidence needed to support actual confusion is relatively small."  Likewise, *Ambrit* stated: "[I]t takes very little evidence to establish the existence of the actual confusion factor."[97]

### C.    Walker's Dealings in Stolen Goods Pose a Special Risk to which Big Lots Should Not Have To Be Subjected

In 1998, Walker was charged with receiving stolen property in the first degree, a class B felony pursuant to Alabama Code § 13A-8-17.  In March 1999, he pled guilty to the lesser included offense of attempted receipt of stolen property in the second degree.  According to Big Lots, Walker's ability to plea bargain down to a misdemeanor one of the incidents where he was recently

---

[96] Big Lots relies upon the following Eleventh Circuit statements: *Frehling* ("If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity"); *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1178-79 (11th Cir. 1994).

[97] *See Safeway Stores, Inc. v. Safeway Discount*, 675 F.2d 1160, 1167 (5th Cir. Panel B 1982)(finding two reported incidents of actual confusion enough); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)("reason tells us that . . . very little proof of actual confusion would be necessary to prove the likelihood of confusion"); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 46 (5th Cir. 1975)(four individuals who exhibited confusion were sufficient); *Amstar* (three individuals over 15 years were sufficient); *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545 (11th Cir. 1985)(10-15 phone calls were sufficient to show actual confusion).  Here, Big Lots argues, more than ten such incidents occurred almost immediately after Little Lots's opening.

indicted does not diminish the significance of this evidence. This evidence, Big Lots claims, is not being offered simply to impeach Walker's credibility as a witness on other matters but is instead highly relevant to the retail closeout/liquidation business in which both parties are engaged. Big Lots cites Rule 609(a)(2) of the Federal Rules of Evidence,[98] and contends that some courts have found similar convictions to involve dishonesty or false statement and thus be admissible for impeachment. *See McHenry v. Chadwick*, 896 F.2d 184, 188-89 (6th Cir. 1990)(applying Tennessee law); *United States v. Wilson*, 536 F.2d 8835, 885 (9th Cir. 1976). *See also United States v. Kiendra,* 663 F.2d 349, 353 (1st Cir. 1981); Charles A. Wright & Victor J. Gould, *Federal Practice & Procedure: Evidence* § 6135, at 249 (1993). According to Big Lots, evidences of convictions that involve dishonesty are mandatorily admissible into evidence. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 525-26 (1989)(holding "Rule 609(a) states that impeaching convictions evidence 'shall be admitted.' With regard to subpart (2), which governs impeachment by *crimen falsi* convictions, it is widely agreed that this imperative, coupled with the absence of any balancing language, bars exercise of judicial discretion pursuant to Rule 403.").

Moreover, plaintiffs argue, this evidence is admissible for purposes other than for attacking Walker's credibility. *See United States v. Solomon*, 686 F.2d 863, 873 (11th Cir. 1982)(noting evidence of felony convictions not admissible for impeachment under Rule 609(a) may be admissible for other purposes if Rule 403's balancing test is satisfied). Walker's prior criminal conduct, Big Lots contends, is directly probative of and relevant to his competing business, posing a risk to Big Lots and its customers. Big Lots argues:

> Walker's criminal history is admissible for the purpose of showing the likely injury to Big Lots' goodwill if it has to share a confusingly similar name with Walker, who has been convicted of a crime directly connected with the line of business in which Big Lots competes with Little Lots. In these circumstances, any prejudicial impact (which is unlikely where Walker has testified freely about the conviction and the other incident) is

---

[98] This rule reads: "For the purpose of attacking the credibility of a witness, evidence that any witness has been convicted of a crime shall be admitted it if involved dishonesty or false statement, regardless of the punishment."

outweighed by the probative value of the evidence on the issues of consumer perception and damage to Big Lots' goodwill and reputation.

**C.**      **Big Lots Is Entitled to Summary Judgment on Its Alabama Dilution and Injury to Reputation Claims**

According to plaintiffs, the likelihood of confusion evidence supports this claim. Big Lots again emphasizes Walker's 1999 conviction (after a guilty plea) for attempted receipt of stolen property and his admission to dealing in stolen goods on other occasions. Under Alabama Code § 8-12-17 (Repl Vol. 2002), likelihood of dilution is all that is required (as opposed to actual dilution under the federal statute).[99] Big Lots argues:

> Against this legal framework, Big Lots is entitled to summary judgment on its Alabama dilution claim. Unrebutted survey evidence shows that 74% of the respondents view Big Lots as either "very favorable" or "favorable." In the Northeast Alabama area, that puts Big Lots second only to the ubiquitous Wal-Mart in terms of favorable recognition and reputation. The tawdry nature of the Little Lots store and Walker's criminal past that is persistent and relates directly to his closeout/liquidation business, provide ample evidence of likelihood of injury to Big Lots' reputation by Walker's use of a confusingly similar mark.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**[100]

**I.**      **Defendants' Motion**

**A.**      **Introduction**

After mentioning the "long, arduous history" of this case, defendants repeat their mantra (quoted from this court's November 2002 order): "there is absolutely no likelihood of confusion by

---

[99] Ala. Code § 8-12-17 provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this article, or a mark valid at common law, including a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Big Lots also cites *Arthur Young, Inc. v. Arthur Young & Co.*, 579 F. Supp. 384, 390 (N.D. Ala. 1983).

[100] The court acknowledges but not restate defendants' facts and arguments already offered in opposition to plaintiff's summary judgment motion, *see supra*. Again, the court notes, some overlap in this Findings of Fact and Conclusions of Law is unavoidable.

people who see the stores, their layouts and their products." According to defendants, the material facts have not changed since denial of a preliminary injunction. Additionally, defendants point out, *Moseley*, *see supra*,[101] was decided in their favor. As in the present case, defendants argue, *Moseley* involved a claim by a national company against a small, local business. The Supreme Court found no dilution of the senior VICTORIA'S SECRET mark by the use of the junior mark, VICTOR'S LITTLE SECRET,[102] even though merchandise at the latter was "tawdry" as compared to Victoria's Secret merchandise. *Id.* at 8, 15. Big Lots argues that *Moseley* has only limited relevance to this case, since it arose under the Federal Trademark Dilution Act ("FTDA") and thus required actual injury to the economic value of a famous mark. *Moseley* further stated that the FTDA does not refer to "likelihood" of dilution, giving it a more restrictive scope than various state acts (such as Alabama's).

**B.     ARGUMENTS**

**1.     Trademark Infringement and False Designation of Origin Claims**

Defendants agree that *Alliance Metals'* seven-pronged test for determining likelihood of confusion applies and that *Lone Star* and *AmBrit* require the court to consider a "totality of circumstances," with the appropriate weight given to each factor varying with the circumstances of each case.

Regarding the alleged strength of the BIG LOTS mark, defendants again highlight excerpts from Big Lots's 2000 and 2002 Annual Reports and statements by company executives in various newspaper articles.[103] Such statements, defendants assert, belie any claim that BIG LOTS is a strong

---

[101] In the November 22, 2002 Findings of Fact and Conclusions of Law, this court noted that the outcome of this case might have application to the instant case.

[102] Defendants observe that the *Moseley* plaintiffs did not appeal the district court's finding of no likelihood of confusion.

[103] These include quotations already discussed in this Findings of Fact and Conclusions of Law, as well as a statement by Larsson, Big Lots's executive vice president of sales promotion's: "We're an untold story." *See* Def. Ex. M. Larsson also stated: "The confusion has been compounded by the fact that Big Lots operates under four names, a phenomena it has been

mark.  The weaker the mark, defendants argue, the less trademark protection afforded to it.  *See*

*Frehling* at 1335; *John H. Harland* at 973.  Defendants cite *Frehling*[104], *Freedom Savings & Loan*[105],

*Holiday Inns, Inc.,*[106] and other cases[107] to buttress their contention that a mark is weakened by large

number of third-parties doing business under similar names, as they contend is the case here.

According to defendants, Big Lots mistakenly emphasizes the incontestability of its mark, since

"[i]ncontestable status does not make a weak mark strong."  *See Oreck v. U.S. Floor Sys., Inc.*, 803

F.2d 166, 171 (5th Cir. 1986).Defendants then argues that the widespread use of the words in the

"Big Lots" mark, as evidenced by its third party usage brief, weighs heavily against a finding of

likelihood of confusion.[108]

Turning to the other *Alliance* factors, [109] defendants argue, the sole similarity between the

---

gradually changing and publicizing with ads.  Big Lots wants to come across as one powerful
brand and is eliminating the other names."

[104] The *Frehling* court stated: "Important in gauging the strength of a mark is the degree to
which third-parties do business under similar names."

[105] The *Freedom* court stated: "the strength of a mark depends on the extent of third-party
usage."

[106] There, defendants argue, the court held that the common word "holiday" was of weak
trademark significance, noting that the word "holiday" was used alone or in combination with
words other than "inn" through the United States, designating motels and restaurants unaffiliated
with plaintiff.  *See* 481 F.2d at 448.

[107] These cases include *Sun Banks* (after considering the fact that many Florida businesses
falling in the category of financial institutions used "sun" in their names, court held: "we find the
extensive third-party use of the word 'Sun' impressive evidence that there would be no
likelihood of confusion between Sun Banks and Sun Federal"); *Amstar* at 252; *Armstrong Cork
Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979)(extensive use of term "World"
suggested no infringement); *El Chico* at 726 (extensive use of words "Chico" or "El Chico"
brought marks within classification of "weak" trade name).

[108] Defendants' arguments and this court's previous findings have been addressed earlier in
this Findings of Fact and Conclusions of Law.

[109] To the extent defendants' arguments and proffered facts have been discussed earlier in this
Findings of Fact and Conclusions of Law, the court does not repeat them here.

parties' marks is "they both contain the word 'Lots' preceded by a word denoting size."[110] The mere fact that the marks share a word, defendants argue, has no significance to a determination of likelihood of confusion, even when applied to similar products or services. *See, e.g., Sun Banks* at 319 (no likelihood of confusion between two financial institutions named SUN FEDERAL SAVINGS AND LOAN ASSOCIATION and SUN BANKS, INC.); *Holiday Inns* at 448 (no likelihood of confusion between HOLIDAY OUT and HOLIDAY INNS, both providing lodging); *Sun-Maid Raisin Growers, Inc. v. Sunaid Food Products, Inc.*, 356 F.2d 467, 489 (5th Cir. 1966)(no likelihood of confusion between SUNAID fruit products and SUN-MAID raisins); *Sears, Roebuck v. All States* at 168 (no likelihood of confusion between ALL STATES LIFE INSURANCE COMPANY and ALLSTATE INSURANCE COMPANY). Noting the court's earlier finding of "some similarity" between the marks, defendants argue: "[I]n light of the totality of the circumstances, that slight similarity is not of sufficient magnitude to lead to a likelihood of confusion."

Regarding any similarity of services,[111] defendants contend: "All that is in common is that both stores sell a variety of goods, and that there may on occasion be certain goods available at both stores." According to defendant, this element does not weigh in plaintiffs' favor. *See Amstar* at 261 (although both parties sold food products, the only common element was that both were edible); *Sun-Maid* at 489 (finding no likelihood of confusion between fruit products and raisins even though both parties' goods were normally sold in food stores and purchased by the same customers).[112] Defendants then contrast the parties' sales and advertising methods based on facts already discussed in this Findings of Fact and Conclusions of Law.

---

[110] Defendants point to alleged different print styles, punctuation, colors, and accompanying phrases used in advertising the respective marks, as already noted by this court.

[111] Defendants detail facts about the store's merchandise and methods of obtaining merchandise already discussed in this Findings of Fact and Conclusions of Law.

[112] According to defendants, Big Lots's retail services and sales methods have not materially changed since the preliminary injunction hearing on September 23, 2002.

Regarding advertising methods, defendants argue that use of the same media, standing alone, is insufficient to sustain a finding of likelihood of confusion: *Sun Banks* at 318; *Freedom Savings* at 1185; *Little Caesar Enterp., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568 (6th Cir. 1987)(noting that "Little Caesar"'s sophisticated advertising program, which included television ads and benefitted from the over 1,000 Little Caesar outlets, distinguished it from the small local business "Pizza Caesar," which had a far less sophisticated advertising program). Additionally, defendants argue, the only material changes to the advertising methods used by the parties since the preliminary injunction hearing are: Big Lots's enhancement of its national television advertising program and less advertising by Little Lots ("currently only running a small advertisement once a week in the local Sand Mountain Reporter, with a small black and white ad listing the Wednesday special attached hereto as Exhibit P, and running a short daily spot on the local radio station WBSA, while maintaining their four billboards"). Defendants' arguments and supporting facts for Walker's alleged lack of intent to capitalize on the BIG LOTS name have previously been discussed.

Regarding actual confusion, defendants first address customer inquiries, noting that none of the allegedly confused customers testified at the preliminary injunction hearing and plaintiffs have neither identified any actual customers in interrogatory responses nor listed any actual customers as witnesses in their pre-trial disclosures. Walker again relies on *John H. Harland* and *Sun Banks* for the proposition that the few inquiries compared to the large number of customers (50,000 during first month Little Lots was open) creates negligible evidence of confusion. Moreover, defendants contend, evidence of customer inquiries as to whether Big Lots and Little Lots are connected does not necessarily demonstrate confusion but rather just the awareness of a potential difference between the two stores. *See, e.g., Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1126 n. 3 (10th Cir. 1991); *Gruner, see supra.* The Eleventh and former Fifth Circuits have often found no likelihood of confusion despite evidence of actual confusion. *See Sun Banks; Amstar; First Southern Fed. Sav. v. First Southern Sav.*, 614 F.2d 71 (5th Cir. 1980)(finding no substantial likelihood of confusion between two banks named "First Southern Federal Savings & Loan Association" and "First Southern

Savings & Loan Association," notwithstanding instances of actual confusion);[113] *Armstrong* at 506;
. and *Sears, see supra.*[114]

Defendants criticize the Powell survey based on the following (discussed extensively above):
(1) its alleged status as a word association test;[115] (2) the ineffectiveness of telephone surveys in a
trademark case;[116] (3) failure to represent the opinions of the appropriate consumers; and (4) a
leading question as its main question.[117]

---

[113] The former Fifth Circuit held:

> Because "First Southern" is a combination of a generic and a geographical term,
> we conclude that it is not subject to protection under Mississippi common law. In
> addition, we believe that under the facts presented the district court was not
> clearly erroneous, See Kentucky Fried Chicken Corp. v. Diversified Packaging
> Corp., 549 F.2d 368, 384 (5th Cir. 1977), in finding that appellee's name and sign
> were not so similar as to be reasonably calculated to deceive the public and to
> injure appellant, See Staple Cotton Cooperative Association v. Federal Staple
> Cotton Co-Op Association, 249 Miss. 465, 162 So.2d at 869.

[114] In *Sears*, defendants further note, the court found persuasive the lack of proof that any
single transaction resulted in any ultimate loss or danger of loss to the appellants. *Id.* at 170.
Here, Walker asserts, Big Lots has offered no evidence of such losses or danger of losses or
provided testimony from actual confused customers. *See Freedom Savings* at 1185 (affirming
district court's finding of no confusion where plaintiff proffered evidence of mistaken inquiries
about the parties' possible affiliation, but none of the allegedly confused persons testified).

[115] To cast doubt on word association tests, defendants discuss *Amstar,* in which the former
Fifth Circuit rejected a survey involving the "Domino's Pizza" mark. There, the makers of
"Domino" sugar alleged trademark infringement against the makers of "Domino's Pizza."
Survey participants were asked if "Domino's Pizza" brought anything else to mind. Even though
71% of participants stated that the Domino's Pizza mark brought to mind sugar, the court held
that the survey did not present any meaningful evidence of likelihood of confusion. *See also
Holiday Inns* (where a survey involving word association between "Holiday Out" and "Holiday"
Inn was entitled to little weight); *We Media, Inc. v. Gen. Electric Co.*, 218 F. Supp. 2d 468
(S.D.N.Y. 2002)(rejecting survey evidence which presented respondents with word lists because
the survey merely measured word associations devoid of context).

[116] *See supra* p. 30.

[117] *See also Simon* (S.D. Ind. 2000)(rejecting survey in which proposed multiple choice
answers suggested the possibility of a connection between the businesses.) Specifically, the
court notes, *Simon* said:

> In *Squirtco*, two soft drinks had the names Squirt and Quirst. The district court
> found a likelihood of confusion based in part on survey results. The two surveys

2.             <u>Dilution Claim[118]</u>

_____

asked respondents to listen either to just the two names or to radio advertisements. The respondents were then asked whether they thought the two products were put out by the same or different companies, and what made them think that. (internal citation omitted). The Eighth Circuit affirmed a finding of likelihood of confusion based on part on the survey.

SPG has modified the *SquirtCo* format in one important respect. The *Squirtco* format in the reported cases offers the respondent three possible answers: same, different, or don't know. SPG insists on including a fourth answer, that the two web page are put out by "related but different companies or organizations." SPG has not cited any case approving that additional, ambiguous twist on the *Squirtco* format, which is likely to create a bias in favor of a finding of confusion. . . . The question about whether the two items are put out by the same or a related source is likely to generate so-called "demand effects" that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who seethe items.
. . .

Respondents viewing the SPG and mySimon home pages might not draw a business connection between them without the proposed multiple choice answers suggesting the possibility of such a connection. To some extent, these potential demand effects are inherent in the *SquirtCo* format, in which the interviewer is instructed to ask a question that raises the issue about a potential relationship or affiliation between the two marks or entities. However, SPG is trying to take the *SquirtCo* format a step farther than any other court has taken it by introducing an additional possible answer. The court does not necessarily view this problem as so serious by itself as to require exclusion of the home page survey, but it adds to the other reasons for excluding the survey.

However, Big Lots distinguishes the *Simon* and Powell surveys. In *Simon*, Big Lots argues, the survey interviewer showed respondents pictures of two web pages of the opposing parties without inquiring whether the respondents were familiar with either of the two parties and without showing web pages of any other companies. Big Lots contends:

Therefore, when asked about whether there was a connection between the two companies putting out the web sites, the absence of controls (i.e., no other companies were inquired about) and other factors distorted market conditions, resulting in responses that were guesswork. None of these criticisms apply to Dr. Powell's survey in this case because the survey established the respondents' actual familiarity with market conditions and the questions were based on that familiarity and associated impressions.

[118] As noted above, plaintiffs' federal dilution claim has been voluntarily dismissed. Because defendants' brief states "for the same reasons that the plaintiffs' federal dilution claim fails, their state law dilution claim must fail", the court considers relevant federal dilution arguments here.

The Alabama anti-dilution statute requires at a minimum a showing that a mark has "distinctive quality." *See* Ala. Code § 8-12-17; *Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018 (11th Cir. 1989)(stating that a dilution action protects the owners of "<u>strong, distinctive marks</u>")(emphasis added); *Arthur Young* at 390 (N.D. Ala. 1983(finding violation of the Alabama anti-dilution statute where defendant "demonstrated that its mark is strong and distinctive.")  Defendants remind the court of its previous finding that the BIG LOTS mark is not strong and again produce statements from Big Lots's own corporative representatives as well as statements from Big Lots's annual reports.  Defendants argue: "A study commissioned by the plaintiffs revealed that only 15% of the national population is familiar with the Big Lots name." Thus, defendants contend, BIG LOTS is not a distinctive mark.

According to defendants, plaintiffs also lack evidence that defendants' use of the Little Lots name dilutes any distinctive quality of the BIG LOTS mark.  Little Lots produces the following quotes from Big Lots's vice president of marketing (which appear in a magazine article): "We've been a well-kept secret, but we can move ourselves up in the market.  There is a perception that we sell second rate or damaged goods"; "Too often, they are confused with down and dirty closeout shops."  Additionally, plaintiffs contend, Big Lots's CFO Jeff Naylor stated: "Big Lots is sprucing up its stores, which by its own admission had become shabby."  *See* Business Week Online.  Since Big Lots's reputation is already admittedly poor, plaintiffs argue, the use of the Little Lots name could not cause dilution.[119]

Lastly, defendants assert, the extensive third-party usage of plaintiffs' mark precludes any showing of distinctiveness. *See Moseley* at 12-13 n.10 (discussing a 1927 article by Frank Schechter on dilution).[120]  *See also Amstar* at 265 (holding that Georgia's anti-dilution statute was not

---

[119] *Freedom Savings*, defendants argue, stated that where a mark is weak without much distinctiveness, the mere use of a similar mark will not establish loss of commercial value.

[120] Specifically, *Moseley* stated:

applicable where it had been determined that the marks themselves were not confusing and that plaintiff's mark was a weak mark).

   3.             **Alabama "Palming Off" Claim**

   In order to succeed on such a claim, defendants contend, plaintiffs must show that defendants' name was "calculated to deceive or likely to deceive" the public. *See Jefferson Home Furniture Co. v. Jefferson Furniture Co.*, 349 So. 2d 5 (Ala. 1977). If the court finds that there is no likelihood of confusion between the parties' names, defendants argue, the "palming off" standard would not be met. In addition, defendants assert, some of their advertisements and billboards have stated that Little Lots is owned by Tony and Nancy Walker or otherwise mentioned Tony by name, which is "hardly consonant with any intent to deceive." *Id.* at 8. Moreover, defendants contend, differences in the goods, display, and format of the parties' operations also supports a conclusion that defendants have not tried to "palm off" their goods as those of the plaintiffs.

_____

        [T]he principal focus of the Schechter article . . . involved an established
   arbitrary mark that had been "added to rather than withdrawn from the human
   voculabulary" and an infringement that made use of the identical mark. FN10

        Schecter discussed this distinction at length: "The rule that arbitrary,
   coined or fanciful marks or names should be given a much broader degree of
   protection than symbols, words or phrases in common use would appear to be
   entirely sound. Such trademarks or tradenames as 'Blue Ribbon,' used, with or
   without registration, for all kinds of commodities or services, more than sixty
   times; 'Simplex' more than sixty times; 'Star,' as far back as 1898, nearly four
   hundred times; 'Anchor,' already registered over one hundred fifty times in 1898;
   'Bull Dog,' over one hundred times by 1923; 'Gold Medal,' sixty-five times;
   '3-in-1' and '2- in-1,' seventy-nine times; 'Nox-all,' fifty times; 'Universal,' over
   thirty times; 'Lily White' over twenty times;--all these marks and names have, at
   this late date, very little distinctiveness in the public mind, and in most cases
   suggest merit, prominence or other qualities of goods or services in general, rather
   than the fact that the product or service, in connection with which the mark or
   name is used, emanates from a particular source. On the other hand,
   'Rolls-Royce,' 'Aunt Jemima's,' 'Kodak,' 'Mazda,' 'Corona,' 'Nujol,' and 'Blue
   Goose,' are coined, arbitrary or fanciful words or phrases that have been added to
   rather than withdrawn from the human vocabulary by their owners, and have,
   from the very beginning, been associated in the public mind with a particular
   product, not with a variety of products, and have created in the public
   consciousness an impression or symbol of the excellence of the particular product
   in question." Id., at 828-829.

In conclusion, defendants argue, the facts are more favorable to them than at the preliminary injunction stage because of the "increased national advertising by Big Lots and decreased local advertising by Little Lots and . . . the discovery of Big Lots Annual Reports and statements by plaintiffs' own executive officers in the public domain admitting the weakness of the 'BIG LOTS' mark."

## II.    Plaintiff's Response

### A.    Walker's Misleading and Inaccurate "Evidence"

Big Lots argues the following: (1) The Ebay link defendants hold out as demonstrating widespread third-party usage is in fact his own and contains a misleading and inaccurate 20-years-in-business claim; (2) Defendants misrepresent their advertising as solely local despite the Internet ad; (4) Defendants rely on this court's statements from its November 2002 order without noting: "Neither are any findings of fact stated above to be considered final. They relate only to a consideration of the appropriateness of a preliminary injunction"; (5) Defendants erroneously contend that in May 2001 Big Lots "began the process of changing its many store names and company name (formerly Consolidated Stores Corporation) to one national brand," (6) Defendants ignore the fact that the first sixteen survey questions and responses had nothing to do with word association but instead measured consumers' knowledge of the "Big Lots" and "Little Lots," stores, their impressions of the stores, whether based on those first-hand impressions they thought the stores were connected, and the type of merchandise carried; (7)Defendants' evidence of third-party usage of "Big," "Little," and "Lots" is "grossly misleading in that defendants fail to establish the requisite conditions for them to have any probative value";[121] and (7) Defendants state that "only about 15%

---

[121] In this vein, plaintiffs argue:

> The fact is that in almost no case was there a company named "Little X" which was in business at the same time as a business named "Big X" where the two companies were unaffiliated and competed in the same line of business in the same geographic area. In the absence of the above conditions, and in the further absence of a showing that such usage adversely impacted public recognition of BIG LOTS as the name of a leading national closeout retailer, third-party usage is

of the nation recognizes the Big Lots name, compared to a 90 percent recognition rate for Wal-Mart," which is derived from both an inadmissible survey and one that stands for an altogether different proposition.[122]

B.    **Defendants' Lack of Evidentiary Support**[123]

According to plaintiffs, most of defendants' evidence consists of recent articles from the Internet discovered by one of their lawyers.  *See* Def. Exhibits B, C, D, E, H, K, L, M, and N. Big Lots deems none of these articles admissible, since neither the authors nor the persons quoted have been deposed.  Additionally, Big Lots argues, the articles have not been properly authenticated since defendants' lawyer is not able to testify to anything other than her own web-surfing.

Similarly, plaintiffs contend, the "evidence" of third-party usage is inadmissible as well as irrelevant/immaterial.  Big Lots's principal trademark is BIG LOTS, not the word "BIG" by itself or "LOTS" by itself.  According to plaintiffs, the strength of the BIG LOTS mark must be evaluated based on consumer impressions of the overall unitary mark, not dissection into separate components.[124]  The combination of the two words is the mark for the purposes of this court's

_____

irrelevant.

[122] Here, Big Lots contends:

> The survey would show that 88% of the public in the surveyed markets (none of which were in Alabama) was familiar with Big Lots in 2001 and 93% were familiar with Big Lots in 2002.  (The 15% figure cited by [defendants] from inadmissible media articles reflected consumer responses to the question, "Write down the names of all of the discount stores that you are aware of" where the first listed response was Big Lots (called "Top of Mind Brand Awareness")).

[123] Motions for summary judgment, Big Lots asserts, must be based upon evidence that is admissible at trial. Fed. R. Civ. P. 56(e); *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).

[124] Big Lots's cases involving the anti-dissection rule include: *Sun-Fun Products, Inc., v. Suntan Research & Dev't, Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985)("overall impression" and not a "dissection of individual features"); *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985)("overall impression"); *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545-46 (1920)("The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail.  For this reason, it should be considered in its entirety."); *John H. Harland* at 976 (11th Cir. 1983)("overall

evaluation, Big Lots asserts. *See Moseley* (after noting that the source identifying trademark is "the combination of the possessive 'Victoria's' and 'secret,'" the court held: "we conclude that 'Victoria's Secret' mark ranks with those that are 'arbitrary and fanciful' and is therefore deserving of a high level of trademark protection.")

Big Lots criticizes defendants for "misapprehending" cases like *Sun Banks*. In such cases, Big Lots contends, courts properly analyze the entire mark but may focus proportionately on the more dominant word when combined with a word that is descriptive of the business (for example, "Sun" in SUN BANKS and SUN FEDERAL SAVINGS & LOAN),  giving greater weight to the dominant word in the mark as opposed to descriptive or generic words like "Bank" or "Savings & Loan" (which cannot be registered). *See John H. Harland* at 975-76;[125] *cf. Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979)(focus on "WORLD"); *Amstar* (focus on "DOMINO"). Here, Big Lots argues, there is no dominant portion in BIG LOTS, so the mark must be evaluated in its entirety.[126] Big Lots contends that the record contains no evidence of the relevant

_____

impression created by the marks as a whole"); *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 423 (6th Cir. 1999)("the anti-dissection rule . . . serves to remind courts not to focus only on the prominent features of the mark, or only on those features that are prominent for purposes of litigation, but on the mark in its totality.")

[125] The *Harland* court found:

> [A]lthough the marks ultimately must be considered as a whole, the focus of the inquiry regarding appearance and sound is on the non-generic portion . . . and while the appearance of the word "Entry" is readily distinguishable from that of the word "Memory," the sound and cadence of the two words are somewhat similar.  With respect to meaning, there is a clear connection between the meaning of Memory Stub and Entry Stub as used on the parties' products, but there also is a distinction between the connotation of Memory Stub, which suggests the process of retaining and/or recalling information, and Entry Stub, which suggests making a record of a transaction for bookkeeping purposes.

[126] Big Lots relies upon the registration history of its mark, noting that the PTO is allowed to register a mark registrable in its entirety that may contain an unregistrable word.  Even though a generic of purely descriptive word may be a part of a multi-word mark and in that combination may be registrable, the applicant must "disclaim" the exclusive right to use the unregistrable descriptive or generic portions.  *See* 15 U.S.C. § 1056(a); Trademark Manual of Examining Procedure ("TMEP") § 1213.03(a).

inquiry, i.e., whether another mark or business name that contains the phrase "BIG LOTS" is in use.

Moreover, Big Lots argues, the business names containing the words "Big," "Little," and "Lots" are "overwhelmingly used as geographically remote business names to identify businesses that are unrelated to retail store services, and are entitled to little weight as a result." *See Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Devel., Inc.*, 824 F. Supp. 1576, 1584 (S.D. Fla.1993)(discounting third party uses in connection with unrelated goods and services). Big Lots contends: "Walker erroneously relies on third party uses without any examination of the goods or services with which the mark is used or the geographic proximity of the uses."

Finally, Big Lots argues, Walker has provided no evidence of a vital element of third-party usage cases: that the alleged third-party uses have had a substantial impact on consumer perceptions of the BIG LOTS marks.[127] "Even unauthorized third party uses of a mark do not necessarily render the mark 'weak.' The proper inquiry is whether the unauthorized third-party uses significantly diminish the public's perception that the mark identifies items connected with the owner of the mark." *University of Ga Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545 n. 27 (11th Cir. 1985). According to plaintiffs, mere evidence of third-party usage, without this link to public perception, is meaningless. *See Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976)("The significant of third party marks depends wholly upon [the manner of] their usage" and noting "Defendant introduced no evidence that these marks were actually used by third parties, that they were well promoted or that they were recognized by consumers.")

Ultimately, Big Lots argues, only the responses to requests for admissions, both parties'

---

According to plaintiffs, the PTO did not require a "disclaimer" of any descriptive words in the BIG LOTS Registration, which provides strong evidence that the phrase "BIG LOTS" is not separable into component elements without violating the anti-dissection rule. Big Lots asserts: "The PTO's ruling is particularly significant because the PTO required disclaimers of other descriptive words in the other registrations issued to Big Lots."

[127] In fact, Big Lots asserts, the Powell survey's finding that 95% of respondents (comprised of area consumers) recognized BIG LOTS directly contradicts any such showing.

answers to interrogatories, the Walker deposition, and the Powell survey are admissible.[128]  Big Lots

emphasizes its new evidence, i.e., the Powell survey, Dr. Hickson's additional testimony, evidence

of Walker's prior conviction as well as new evidence from his deposition, and new facts relating to

the opening of Big Lots stores in northeast Alabama and Big Lots's advertising expenditures.

C.     **What Has Changed from the Preliminary Injunction**

In November 2002 no survey existed.  Now the Powell survey results are available.  Whereas

the court previously noted "the contrast between the words 'Big' and 'Little' could not be more

distinct," now Dr. Powell's and Dr. Hickson's testimony indicates "there is no more effective way

to confuse than to use opposites."  To the extent this court deemed evidence of widespread third-

party usage as distracting from the distinctiveness of the Big Lots Mark, Big Lots argues,

defendants' third-party usage brief contained misleading and inadmissible evidence.[129]  Additionally,

this court's previous order indicated the court's impression that there was no confusion likely from

consumers who actually see the two stores, noting the superior appearance and setup of Big Lots

versus the inferior setup of Little Lots.  Now, the Powell survey results show otherwise, Big Lots

contends.  Big Lots argues:

> Consumers have become accustomed to a single company or affiliates,
> operating under two or more similar but different names: e.g., Target
> and Super Target; Wal-Mart and Super Wal-Mart; Holiday Inn and Holiday

---

[128] Among the alleged inadmissible items are the Big Lots annual reports found on the
internet.  According to Big Lots, these have not been authenticated and "indeed, . . . show on
their face that they are incomplete.  For example, the Table of Contents of the purported 2002
report [Def. Ex. I] shows on its face that it has at least 58 pages.  The same is true of the
purported 2000 annual report [Def. Ex. J] which has not been authenticated by anyone in a
position to do so, and contains virtually none of the contents which annual reports of public
companies are required by law to cover."

[129] Plaintiffs' motion to strike this evidence contends that there have been virtually no "Little
X" companies operating simultaneously in the same line of business in the same competitive
geographic area as any unaffiliated "Big X" business.  Big Lots argues: "It proves absolutely
nothing to assemble as many names as possible from various lists without any evidence that they
actually carried on a business, the nature of the business, where they were doing business and
when they ceased doing business.  In contrast, Big Lots's professionally conducted survey shows
that Big Lots is known and recognized distinctly by 95% of consumers within the relevant
geographic area, decisively overcoming any distraction attributable to third-party usages."

Inn Express; Marriott Hotel and Courtyard by Marriott; Jim Walter Homes
and Jim Walter Resources; RealtySouth, TitleSouth and MortgageSouth.
The public would thus be conditioned to accept the prospect that a down-
scale version of Big Lots might well be an affiliate named "Little Lots."

Rather than "Little Lots" being a small, local legitimate business unlikely to do damage to

Big Lots in the short term, the evidence now shows: (1) "Walker's extend[ed] reach nationally and

internationally through the internet, where consumers do not see his store but see only the words

'Little Lots'"; and (2) Walker's conviction for receipt of stolen goods.

### D.   Big Lots's Survey Evidence is Decisive.

All *Daubert* standards have been satisfied, Big Lots argues, and the admissibility of the

survey has not been challenged.  Big Lots seeks to counter Walker's criticism of: (1) the initial

qualifying question of whether "you or a member of your family shopped" in the Boaz-Guntersville

area during the past year;[130] (2) the survey is a mere word association test;[131] (3) the

stimulus/response section of the survey;[132] (4) telephone surveys; and (5) the key question "Based

---

[130]Big Lots notes that 52% of the respondents actually resided in Marshall County, where
Boaz and Guntersville are located, while the other respondents came from counties contiguous to
Marshall County except for 10% from nearby Blount and Calhoun Counties.  Furthermore, Big
Lots argues, in answers given to subsequent questions, the respondents demonstrate specific
familiarity with the Boaz (99% familiar) and Guntersville (95% familiar) shopping areas, Big
Lots (95% familiar), and Little Lots (74% familiar).  For Little Lots, Big Lots argues, the 74%
figure shows a high degree of familiarity considering the store had only been open about a year.
Moreover, Big Lots observes, the survey also tested whether the respondents had an accurate
perception of the kind of goods Little Lots carried, and such respondents correctly identified the
type of goods both handled and not handled by Little Lots.  Thus, Big Lots argues, "the survey
demonstrates internally that the respondents did unquestionably have the personal specific
familiarity with the [relevant marketplace and stores] to provide reliable answers to the questions
presented."

[131] As detailed above, Big Lots argues that the sequence of questions first established that the
respondents were familiar with Big Lots and Little Lots stores and "then ascertained their belief
as to whether those stores were connected, based on impressions arising out of that personal
familiarity."

[132] These questions were purposefully placed at the end of the survey, Big Lots argues,
"precisely to avoid any reasonable contention that the stimulus-response test biased the results
about the connectivity of Big Lots and Little Lots."  Big Lots calls this section in many ways a
separate survey, purely designed to give Dr. Hickson data for his report on why "opposites" are
highly like to confuse.  Big Lots further contends: "It really was two distinct surveys bundled
into one for economic reasons.  It is simply false to suggest that the results showing 34% actual

on your impressions, would you say the store known as 'Little Lots' is (a) connected with Big Lots in some way or (b) not connected with Big Lots in any way?"[133] Again, Big Lots contends, the Eleventh Circuit looks positively upon survey evidence, *see supra*.

### E.    **The Other Key Factors Without Dispute Favor Big Lots**

Big Lots argues that this court's previous finding that "Big Lots and defendants both offer retail store services involving the sale of a variety of goods at closeout prices," aligns with the relevant test for similarity of goods or services, set out in *Frehling*, *see supra*.   According to plaintiffs, the Powell survey:

> definitely indicates that consumers see the similarity in the retail store services offered by the parties.  The survey respondents had high recognition levels for both Big Lots and Little Lots, and also correctly identified the type of merchandise sold at Little Lots.  With these indicators of consumer awareness about the operations, it is very significant that over one-third of the respondents thought there was a connection between Little Lots and Big Lots.

Citing *Ambrit* as establishing the relevant test for similarity of sales methods, Big Lots contends that this court's previous findings in this regard still weigh in favor of likelihood of confusion.[134]   Based upon both this court's previous finding that the BIG LOTS Mark and

---

confusion and another 33% possible confusion were based upon anything other than specific familiarity with Big Lots and Little Lots."

[133] According to Big Lots, it is permissible in a survey to ask the decisive question in a manner that posits the possibility to the respondents that there may be some form of sponsorship, approval, or licensing behind the junior user's store. *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001)(holding proper the question: "Do you think that the billiard parlor in these photos is owned or operated by Clicks Billiards or do you think that the billiard parlor in the photos is owned and operated by a different company?")

In the case of a well-known senior mark, Big Lots argues, it may even be permissible to pose a hypothetical question to respondents relating to the junior entry into the market. *See McDonald's v. McBagel's* at 1278 (holding proper the question "Though you may or may not have seen or heard of this restaurant, who do you believe sponsors or promotes MCBAGELS?" and noting: "It was not unfair to hypothesize a larger entity's sponsorship of defendant's restaurant to determine whether an association with McDonald's was triggered by the name 'McBagel's.'"); *see also James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976)(approving similar questions that suggested sponsorship).

[134] Big Lots relies upon the following statements from this court's October 2002 Findings of Fact:

Registration were "suggestive" and incontestable, Big Lots asserts its entitlement to a presumption that the BIG LOTS Registration is a strong mark.[135]  Regarding advertising methods, Big Lots reiterates the significance of defendants' Internet advertising.[136]  On the issue of intent, plaintiffs submit: "[T]he new evidence of Walker's intent comes from him alone."[137]

These factors are dispositive of its Alabama "palming off" claim, Big Lots contends, citing *Jefferson Home Furniture* at 8 ("Unfair competition generally consists of 'palming off' on customers, who are buying with ordinary care, the goods or business of one person as and for the goods or business of another.")  Big Lots adds: "[A] preponderance of the evidence shows that Walker carefully has cultivated the image that his Little Lots stores is a scaled down version of plaintiffs' Big Lots stores, and the stores are in the same geographic area, cater to the same customers, both offer closeout goods at discount prices, and have similar names."

F.    **Big Lots Is Entitled to Prevail on State Law Dilution.**

According to Big Lots, this court's preliminary finding that "the evidence shows that the LITTLE LOTS store does not have the quality of goods, display, and format that plaintiffs do in their BIG LOTS stores" "captures the essence of Big Lots'" dilution claim.  *See* Ala. Code § 8-12-17.  The statute requires proof that the BIG LOTS marks are valid and distinctive and that Little Lots's use is likely to either dilute the BIG LOTS Marks or cause injury to BIG LOTS's business

---

> Plaintiffs' Guntersville BIG LOTS store and defendants' LITTLE LOTS store both are located in large buildings in multiple store shopping centers, have several thousand feet of retail floor space, and both have a combination of brand name and non-brand name items offered at discount prices.

The stores cater to customers who are looking for goods at closeout prices.

[135] These argument and supporting cases have already been discussed.

[136] Big Lots highlights Walker's testimony that he seldom uses computers and does not surf the web.

[137] The court will not repeat evidence about the earlier Cullman store, the Ebay Internet ad, and Walker's criminal conviction.

reputation. Unlike the federal dilution statute, the Alabama statute does not require either a showing that the plaintiff's mark is famous or a showing of actual dilution. Instead, the court must consider whether the mark is strong and distinctive and whether there is a likelihood of dilution or injury to business reputation.[138] In a dilution claim, Big Lots contends, the trademark owner must show that the marks in question are similar, and that "the contested use is likely to injure [plaintiff's] commercial reputation or dilute the distinctive quality of its marks." *See Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F. Supp. 1031, 1039 (N.D. Ga. 1986)(applying Georgia anti-dilution provision)(citation omitted).[139] Big Lots provides the following evidence that dilution is likely to occur: (1) photographs of the LITTLE LOTS store (indicating no emphasis on quality of goods, display, and format); (2) facts recited earlier about disorganized display and salvage-quality merchandise, etc.; (3) the similarity of the LITTLE LOTS mark with the distinctive BIG LOTS Marks; and (4) Walker's conviction, which allegedly "relates directly to his business and is for dealing in stolen merchandise."

III.       **Defendants' Reply**

     A.       **Plaintiffs' Survey Is Not Meaningful Evidence of Confusion.**[140]

            1.       **The Survey Respondents Were Not Familiar with the Little Lots Store**

Defendants highlight the fact that 49% of the total respondents surveyed stated that they did not recognize the name "Little Lots" or "just recognized but could not rate" it. Thus, defendants contend, nearly half the respondents were <u>not</u> familiar with the Little Lots store (having not enough familiarity to even give the store a rating, "the conclusion necessarily being that they had never even been in the store.")

Evidence that respondents correctly identified the types of goods handled by Little Lots,

---

[138] For this reason, Big Lots contends, *Moseley* has little relevance on this issue.

[139] Big Lots notes that Alabama's anti-dilution provision is modeled on the Model State Trademark Act, which is substantially similar to Georgia's anti-dilution provision.

[140] Defendants reference but do not restate all earlier arguments in this vein.

Walker contends, is of little value because "Little Lots does not know in advance what goods it will have to offer on any particular day, its inventory depending on what goods Walker has been able to acquire on a spot purchase basis." Addressing the survey results, while 76% of respondents correctly answered that the Little Lots store would sell factory seconds, and 71% answered that the Little Lots store would sell discontinued, damaged, distressed, or out-of-date merchandise, 43% of those who gave those correct answers also answered that they did not recognize or could not rate the Little Lots store. *See* Def. Ex. R. Defendants argue:

> Clearly, if a respondent did not recognize the store or could not rate it, he was necessarily guessing when selecting from the suggested categories of items the store might sell. Those responses merely demonstrate that the name "Little Lots" is descriptive of the items offered by the store and that respondents were therefore able to guess some of the items sold in the store, particularly when those items were broad categories from which the respondent was asked to select.

### 2. The Survey Was a Word Association Test

Hickson's statement that he "consulted with Dr. Larry Powell in the design of the word association aspects (items 17-23) of the survey he conducted in this case" manifests the intention behind the survey, defendants argue. Even if initial "impression" questions were asked, defendants contend, the responses to the key survey question – "Would you say the store known as 'Little Lots' is connected with Big Lots in some way, or not connected with Big Lots in any way?" – were "clearly based on an association of the names of the stores, rather than a familiarity with the stores."[141]

### 3. The Key Question Suggested a Connection between Big Lots and Little Lots

According to defendants, obviously the key question was "leading," as indicated by both the language of the question and the statistics cited above. Defendants rely upon *Beneficial* (*see discussion supra*), distinguish *Universal City Studios*, and further analyze *Simon*.[142]

---

[141] Defendants repeat the earlier-cited statistics and quotation from *Amstar*, *see supra*.

[142] In *Simon*, defendants argue, the court excluded a survey for multiple defects, including that the "survey's questions implicitly suggest to the respondent the possibility of a business connection between the SPG and mySimon home pages that the respondent may not have made

4.    **The Use of a Telephone Survey Further Emphasized the "Word Association"**

Defendants contend their cited cases "hold that use of a telephone survey in a case such as this one diminishes its value, because the participants were unable to see the visual image of the mark and its usage, or the product (in this case, the stores themselves), which is an essential aspect of the likelihood of confusion analysis." Defendants again quote *Inc. Publishing, Riviana,* and *Spraying Systems.* Evidently, defendants argue, this circuit gives little weight to consumer surveys, particularly when such surveys degenerate into word-association tests.[143] Defendants distinguish plaintiffs' cases on this point, stating that none of them address the use of survey evidence to prove actual confusion in a trademark infringement case.[144]

B.    **The Likelihood of Confusion Factors**

1.    **BIG LOTS is Not a Strong Mark by Admission of the Plaintiffs and By Virtue of Extensive Third-Party Usage**

In Big Lots's responses to plaintiffs' Request for Admission No. 12, Big Lots admitted that

---

on his or her own." The court found: "Respondents viewing the SPG and mySimon home pages might not draw a business connection between them without the proposed multiple choice answers suggesting the possibility of such a connection." *Id.* at 1049. Likewise, defendants assert, the multiple choice answers offered to the survey respondents also suggested the possibility of a connection between Big Lots and Little Lots.

[143] Again, defendants rely upon *Amstar, Holiday Inns,* and *Frehling.*

[144] Defendants attempt to distinguish the cases as follows: *Johnson & Johnson* (not involving trademark infringement or survey evidence offered); *Gift of Learning* (secondary meaning case where no survey evidence offered); *Jellibeans* and *Conagra* (while mentioning the existence of survey evidence relating to secondary meaning, not emphasizing or heavily relying on it).

Specifically, this court observes, the *Jellibeans* court stated:

> Jellibeans clearly is an arbitrary mark as applied to roller rinks. Survey evidence introduced by Jellibeans, Inc. showed the 96% of those interviewed had heard of Jellibeans, indicating strong recognition of the mark. Finally, there is ample evidence in the record that Jellibeans is the only roller rink in the United States using a candy name. In light of this evidence, we hold that the district court's finding that Jellibeans is a very distinctive mark entitled to broad protection is not clearly erroneous.

the 2002 annual report contained this statement: "While we are a national retailer with nearly 1,400 stores, our brand awareness is still quite low."   Regarding the annual reports and news articles, Walker contends, such statements are admissions of party-opponents and therefore not hearsay. Furthermore, defendants contend, Big Lots has waived any objection to these statements' admissibility.

Regarding the third-party usage brief, defendants note, such evidence was submitted to this court more than a year ago, at the court's request, and without objection by plaintiffs.   Thus, defendants argue, plaintiffs have waived any objections to the admission of this evidence. Furthermore, the exhibits are absolutely relevant to the case, as many use the word "lots" in the context of consumer sales.[145]

Plaintiffs misstate the anti-dissection rule, defendants claim, since the rule applies only to determine the similarity of marks, not to third-party usage.   The rule provides: "although examination of the components of each mark may be helpful, the determination of similarity is made on the basis of the marks in their entireties." *See Jet, Inc.* at 419.   Defendants provide the following quotes: (1) *John H. Harland* at 975 ("The similarity of design is determined by considering the overall impression created by the mark[s] as a whole rather than simply comparing individual features of the marks")(emphasis added); (2) *Sun-Fun Products* at 189 ("Our analysis begins with the well-established proposition that similarity of design stems from the overall impression conveyed by the mark and not a dissection of individual features")(emphasis added); and (3) *E. Remy Martin* at 1531 ("In evaluating similarity of marks, we must consider the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks,

---

[145] *See, e.g.,* "Mini Lots" (specializing in the "remarketing of distressed merchandise); "Lots for Less" (retail store for groceries and consumer goods); "Rose's Little Lots Thrift Shop" (thrift shop); "L.O.T.S. Inc." (goods, wares, and merchandise and personal property of every class and description); "Lots More Merchandise" (general merchandise); "Lots for Less" (surplus and salvage stores); "LotsOff (department store); "Lotz of Stuff" (miscellaneous general merchandise); "Lots to Love, Inc." (Women's clothing); "Kidz' Lots" (retail store services); "Lots for Tots" (retail store services); and "Lots for Less" (retail department store services).

as well as the manner in which they are displayed.")(emphasis added).

None of these cases, defendants assert, hold that the court may not analyze third-party usage by examining the usage of particular words in each party's marks. On the contrary, defendants argue, the Eleventh and former Fifth Circuits have analyzed third-party usage of a trademark by looking at usage of particular words making up the trademark. *See Holiday Inns*; *Sun Banks*; *Amstar*; *Armstrong Cork Co.*; and *El Chico*.[146]  Nor must a court determine that similarly named businesses operated during the same time period, in the same line of business, and in the same geographic location. In fact, defendants contend, *Amstar* (which involved a dispute between the makers of Domino sugar and Domino's Pizza) held the opposite. The former Fifth Circuit, after examining the extensive use of the Domino mark from 1885 to 1980, held:

> The district court dismissed those and other third-party uses as long
> abandoned; remote as to goods or geography; small, obscure and
> localized; or used only in shipments to the trade. We do not believe
> that such extensive third-party use and registration of "Domino" can
> be so readily dismissed. The impact of such evidence is not dispelled
> merely because "Domino" cigarettes and matches are not leading
> brands, or because some uses of the mark "Domino" by third parties
> have not been related to food products . . . . The extensive third-party
> uses documented in this case were entitled to much greater weight than
> were accorded them by the district court.[147]

Moreover, Walker asserts, evidence of third-party usage does not have to be localized to a particular state. *See El Chico* (where the former Fifth Circuit considered the widespread usage of the words "El Chico" in New York, West Virginia, Pennsylvania, Illinois, New Jersey, Granada, and Mexico).

Turning to the "Little Lots" ebay site, counsel for defendants blames the reference on haste and states that it was not intended to mislead this court. Defendants state:

> [T]he cloud has a silver lining because the website further illustrates

---

[146] These cases have already been discussed.

[147] In *Amstar*, the court notes, the third-party uses at issue were 72 registrations of the "Domino" mark in the U.S. Patent Office. Of those, defendants presented extensive evidence of 15 third-party uses of the "Domino" mark from 1885 until the present.

that Walker had no intent to trade on the Big Lots name when he
opened the Little Lots store in Boaz. Thus, instead of Mr. Walker
having begun using the name Little Lots again in July of 2002, his
usage dates back another four years. As explained in the affidavit of
Anthony L. Walker and Toby Walker, defendant 50% Less and More
Store has listed certain items for sale on the internet shopping website
called "ebay" under the "storefront" name "Little Lots" since 1998.

## 2.    Similarity of the Marks

Defendants criticize plaintiffs' depiction of their mark as "just the two block-letter words

"BIG LOTS," with no stylization, no logo – just the unadorned two words 'BIG LOTS.'" Walker

repeats alleged evidence to the contrary, including the exclamation point, attendant words, and bold

coloring.

## 3.    Similarity of Services Offered by the Parties

According to defendants, plaintiffs "conveniently ignore" other findings from the November

2002 order, including: "The court finds that the services offered by plaintiffs and defendants are

similar only to the extent that they both sell a variety of consumer products to the public" and

"[T]here is absolutely no likelihood of confusion by people who see the stores, their layouts and

their products. The evidence shows that the LITTLE LOTS Store does not have the quality of

goods, display, and format that plaintiffs do in their BIG LOTS stores. 'Big Lots' has an obviously

more sophisticated operation with an apparently better line of products and display."

Defendants repeat that (1) 49% of the survey respondents either could not recognize the

name or just recognized but could not rate Little Lots and (2) half of the respondents who followed

the survey's leading question and stated that the Little Lots store would be connected with Big Lots

fell in that group. Those respondents had clearly not seen the stores, their layouts and their products,

defendants argue.

## 4.    Similarity of Sales Methods

Again, plaintiffs accuse Big Lots of selectively quoting this court's preliminary findings then

restate other findings and additional evidence in the record to show dissimilarities.[148]

### 5. **Advertising**

Defendants deem the "Little Lots" ebay site "an outlet for the sale of goods online, not advertising."[149]  Defendants rely on new declarations by Tony Walker and Toby Walker (a sales representative for 50% Less and More Store) for the following: 1) the ebay site does not reference or identify the physical location of the Little Lots store in Boaz; 2) the toll free number is to the 50% Less and More Store in Albertville; 3) the ebay site is not providing or advertising for Boaz's Little Lots but rather providing "an online site for selling certain unique items that are 'too nice' to sell in the 50% Less and More Store"; 4) Tony Walker does not consider the ebay site to be "advertising," thereby rendering true his interrogatory answer that "Little Lots regularly advertises only in the truly local newspaper, the Sand Mountain Reporter, on the local Boaz radio station, and on a few local roadside billboards."

Furthermore, Walker observes, the court found earlier that "the advertising, although both use newspapers, is obviously distinguishable in form, color and layout."  In addition, defendants point out, Big Lots has enhanced its national television advertising program since then, embarking upon a nationwide television ad campaign to increase name recognition. *See* Exhibit I.

### 6. **Defendants' Intent**

Defendants contend that the statement on the ebay site about "20 years in business" is true, since defendants have been doing business at the Albertville 50% Less and More store for over 20 years.  Furthermore, "the defendants' use of the name 'Little Lots' on the ebay site since 1998 is actually further evidence that defendants utilized the name 'Little Lots' as the name of their Boaz store because it is descriptive of the business and defendants have previously used the name (both

---

[148] These facts have already been detailed earlier in this Findings of Fact and Conclusions of Law.

[149] Even if the Little Lots ebay site is considered advertising, defendants contend, it does not resemble BIG LOTS's professionally designed website which provides links to information about store locations, financials, employment prospects, press releases, and self-promotions.

for their Cullman store in 1993-94 and on the internet since 1998).  Deeming the ring of 9 Big Lots stores surrounding Boaz insufficient evidence of intent, defendants again cite *El Chico* and allege pure intentions in opening the Boaz store.

### 7.    Actual Confusion

In *Holiday Inns*, defendants observe, the Eleventh Circuit affirmed the trial court's conclusion that evidence of nine letters, a memorandum purporting to show an instance of actual confusion, the results of a survey, and the video deposition of a lexicographer merited little weight. *See*  481 F.2d at 447.

### B.    Alabama "Palming Off" Claim

Defendants rely on previously cited arguments and caselaw, *see supra*.

### C.    The Dilution Claim[150]

After repeating arguments and facts noted earlier, Big Lots also addresses plaintiffs' observation that the Powell survey showed that 74% of the respondents view Big Lots as either favorable or very favorable.  Defendants contend that Little Lots's rating must also be considered. Only 7% of the respondents rated Little Lots "unfavorable" or "very unfavorable," as compared to the 5% of respondents that rated Big Lots "unfavorable" or "very unfavorable."  Defendants remind this court that 44% rated Little Lots as favorable or very favorable, and 49% did not rate Little Lots at all because the either did not recognize the name or just recognized but could not rate the store. Defendants contend: "Given the fact that most of those surveyed did not rate Little Lots unfavorably, it seems difficult to contend that it is hurting Big Lots' reputation."  Moreover, defendants assert, plaintiffs lack evidence that defendants' use of the Little Lots name is likely to dilute the "distinctive quality" of the Big Lots marks or cause injury to Big Lots's business reputation – a requirement of Ala. Code 8-12-17.

---

[150] Defendants argue: "Interestingly, plaintiffs insist that the Big Lots store and the Little Lots store are so similar as to be confusing, yet they are quick to distinguish the two operations for purposes of the dilution claim."

Addressing Walker's alleged criminal "record," defendants insist that it includes only <u>one</u> misdemeanor conviction of receiving stolen property (<u>not</u> a felony or multiple incidents). Defendants contend that the 1999 misdemeanor guilty plea is not properly admissible because the charge was a misdemeanor <u>not</u> involving "dishonesty or false statement." *See* Fed. R. Evid. 609.[151] Walker informs the court that: 1) Walker purchased a quantity of grocery-related products from a business with which he had done business for several years; 2) Walker had no cause to believe that the merchandise was stolen at the time he purchased it, and the merchandise was not purchased at a 'bargain' price indicating something was wrong; 3) Walker had to just broker the merchandise to another company because the items were 'too expensive' for him to be able to offer them for sale in the 50% Less and More Store; and 4) After receiving inquiries from the authorities, Walker located the merchandise (which had been resold in a lot) and arranged to have it held for the authorities.

**PLAINTIFFS' MOTION TO STRIKE**

I.    <u>**The Motion**</u>

Regarding Exhibits D, E, K, L, M, and N (newspaper, magazine, or on-line articles located by counsel for defendants off the Lexis-Nexis site or Internet), Big Lots moves to strike these exhibits as inadmissible hearsay being offered for the truth of the matters asserted in the articles. *See Macuba*. Regarding Exhibits B and C (purported excerpts from Big Lots's website), Big Lots contends that they have "not been authenticated by anyone with personal knowledge concerning their content or the accuracy or completeness of the contents." For Exhibits I and J (purported complete Big Lots's Annual reports for 2000 and 2002), Big Lots argues, such documents have not been authenticated and "it is obvious from even a cursory review of the exhibits that they are not the complete annual reports." Regarding Exhibit P (a purported Little Lots advertisement), Big Lots raises an authentication issue.

---

[151] Defendants take umbrage with plaintiffs' repeated references to Walker as a "convicted felon."

Big Lots further objects to Appendix 1 and Exhibits A, B, and C of defendants' third-party usage brief, which consists of a collection of miscellaneous company names assembled by defendants to show widespread use of 'little' or 'big' in names of Alabama businesses and 'lots' in business names in other states. Plaintiffs deem this evidence "inaccurate, grossly misleading, and ha[ving] no relevance or probative value whatsoever."

According to Big Lots, defendants have not shown that these listed entities were ever viable businesses, that they operate currently, "or that any 'Little X' company existed during the time frame in which a 'Big X' company existed, or that any 'Little X' business was in the same line of business as a 'Big X' business, or that any 'Little X' business operated in a geographic area in which any 'Big X' company operated." Big Lots argues that the "Lots"-related examples suffer from similar problems. Big Lots invokes Federal Rule of Evidence 403, contending that any probative value is substantially outweighed by the danger of unfair prejudice.

As an actual example from defendants' third-party usage brief, Big Lots compares the following information: "Little Creek" Timber Company, which operated in Washington County, Alabama for nine years until its dissolution on 4/20/79, and "Big Creek" Construction Corp., which commenced operations 8/27/93 in Coffee County, Alabama. Since the companies were at least 200 miles apart and engaged in entirely different types of businesses, Big Lots argues, such information has no relevance to any of the issues in the case.

Defendants' "mix of names," Big Lots contends, is flawed because they "do not show or document a single case where two companies with 'Little' in one name and 'Big' in the other (or outside Alabama, business with the word 'Lots' in them) competed with each other simultaneously in the same line of business in the same geographic areas." The majority of "Lots" names offered by Walker, Big Lots also asserts, did not show the business or services of the entity, when it was in operation, or whether it was still in operation. Big Lots again relies upon *Breakers of Palm Beach* at 1584, *see supra*. Big Lots draws the court's attention to its time-consuming research of defendants' proffered business names in the Alabama Secretary of State's Office and elsewhere,

which allegedly revealed that most of the Alabama businesses no longer exist (some ceased to exist prior to 1915) "and that in no case, or virtually no case, did any 'Little X' entity do business in the same line of business, during the same time frame, in the same geographic area, as any 'Big X' entity."

Finally, Big Lots contends, defendants have not made the required showing that these business names impact on the public's perception of Big Lots as a distinct business engaged in the closeout retail business. *See supra, University of Georgia Athletic Ass'n* and *Scarves by Vera.*

## II.    **Defendants' Opposition**

Most importantly, defendants argue, Big Lots has waived objections to these documents, since all of them were identified in defendants' pretrial disclosures pursuant to Fed. R. Civ. P. 26 (a)(3)(C), filed with this court, and served on plaintiffs on October 15, 2003.  Most of the now-contested documents were specifically described by author, title, date, location, etc.  Also, defendants argue, defendants specifically disclosed their intent to introduce evidence from Big Lots's website or links found on that website as well as Internet articles about Big Lots "describing, among other things, the evolution of the company, its products, its financial condition, its investor relations, its SEC filings, its reputation, and its customer base."  Since plaintiffs failed to timely object to defendants' disclosures (within 14 days after disclosures were made), defendants argue, such objections are now waived.[152]  Furthermore, information from defendants' third-party usage brief was submitted to and already considered by this court over a year ago during the preliminary injunction request stage.  Since plaintiffs failed to object to that evidence upon submission, Walker argues, objections should now be deemed waived.

That said, defendants' assert, defendants' exhibits are all admissible.  Exhibits B and C come

---

[152]  The court observes that Rule 26(a)(3) excepts objections under Rules 402 and 403 as well as evidence "excused by the court for good cause."

directly from plaintiffs' website (www.biglots.com).[153] Exhibit B contains the BIG LOTS logo, the notation "Copyright 2002-2003 Big Lots Stores, Inc," and a printed notation on its lower left corner showing the location on the internet from which the document was obtained. The document's contents include information about Big Lots that could only have originated from Big Lots. Similarly, Exhibit C is a press release with the "BIG LOTS!" logo displayed prominently at the top. Again, the document contains self-promoting information about Big Lots which could only have originated with Big Lots.

Defendants argue that the defendants do not have to depose plaintiffs' witnesses to authenticate these documents. Instead, "[a] document may be authenticated by '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" *See United States v. Siddiqui*, 235 F.3d 1318 (11th Cir. 2000)(holding that such factors supported authenticity of e-mail); *see, e.g., United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2nd Cir. 1990)(holding that a document was sufficiently authenticated in part based on the fact that "[i]t bore a Los Macheteros logo that was indistinguishable from the Los Macheteros logo that appeared on other documents whose authenticity were not challenged."); *Perez v. Alcoa Fujikura, Ltd.*, 969 F. Supp. 991, 998-99 (W.D. Tex. 1997)("[A]ll the documents in question are dated and bear Arneses' company logo, pre-printed address and telephone number, all of which show authenticity . . . . These are sufficient indicia of reliability and authenticity to overcome the plaintiffs' objections.") Defendants also rely upon pronouncements from Wright & Gold, Federal Practice and Procedure[154] and *United States v. Gonzalez-Maldonando*.[155]

---

[153] Defendants cite Rule 901, which provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

[154] "The location in which the item in question was found, and other particulars regarding its discovery, are often external circumstances pertinent to authentication." *Id.* at § 7109 (2000).

[155] 115 F.3d 9, 20 ("The notebook was found, along with Robles' identification card, in a briefcase in Robles' room. Such circumstantial evidence is permitted in order to authenticated the item.")

Here, defendants argue, defense counsel's affidavit provides authentication that the documents were obtained from the Big Lots website, which is owned, sponsored, and maintained by plaintiffs. Finally, defendants contend, the exhibits are self-authenticated pursuant to Fed. R. Evid. 902(7), which provides that no extrinsic evidence is required to authenticate "[i]nscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control, or origin." As stated in Wright & Gold's treatise, "[T]he item to which the trade inscription is affixed is also authenticated under this provision." Wright and Gold reasons that forgery of trade inscription is relatively rare because of the legal sanctions for trademark infringement and unfair competition.

Furthermore, defendants argue, the statements by Big Lots's corporate representatives in published articles (Exhibits D, E, K, L, M, and N)[156] are admissions of a party-opponent under Fed. R. Evid. 801(d)(2). Plaintiffs' CEO, CFO, and executive vice-president, defendants contend, are clearly agents of Big Lots. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 557 (11th Cir. 1998)(noting that "senior officers of a corporation normally are agents an servants of the corporation"). Defendants add that these documents are also self-authenticated pursuant to Fed. R. Evid. 902(6) because they are printed articles from newspapers and periodicals. According to Walker, Rule 902(6) applies to copies of newspaper and periodical articles, including those printed off the Internet. *See* Wright & Gold § 7140; *In re First Hartford Corp.*, 63 B.R. 479 (S.D.N.Y. 1986)(holding that two articles photocopied from journals and one article printed from Lexis/Nexis were self-authenticating pursuant to this rule).[157]

Defendants admit that the 2000 and 2002 Big Lots annual reports (Exhibits I & J) are not complete. Relevant excerpts were submitted, defendants contend, in order to limit the large volume

---

[156] Exhibits K & N were allegedly obtained through "links" provided by plaintiffs on the Big Lots website.

[157] Defendants provide further authority, *see e.g., Murray v. Sevier*, on the authentication issue for newspaper articles. However, since plaintiffs have not raised the authentication issue for these particular exhibits, this court will not restate that authority here.

of evidence submitted to the court.  Defendants offer to submit the entire reports upon the court's request.  These items are authenticated pursuant to Rules 901(b)(4) and 902(7), defendants contend, and both display the BIG LOTS logo and contain self-promotional information that could only have originated with the company.  According to defendants, such statements also represent admissions of a party-opponent.

Exhibit P (a newspaper ad provided in response to plaintiffs' Request for Production), defendants contend, is self-authenticating pursuant to Rule 902(6) because it was copied from The Sand Mountain Reporter. *See Plitt Theatres, Inc. v. Am. Nat'l Bank and Trust Co.*, 69 F. Supp. 1031 (N.D. Ill. 1988)(holding that copies of newspaper advertisements are self-authenticating under Rule 902(6)).

According to defendants, information from its third-party usage brief (which was submitted in response to this court's October 29, 2002 order and which was incorporated in part by the court's November 2002 Findings of Fact) is admissible.[158]  First, defendants argue, this brief simply followed this court's October 29th order, which did not limit its inquiry to extant businesses or businesses operating in the same geographic area, time period, or line of business.  Second, defendants contend, this court is not required to make such a determination when considering third-party usage.  *See supra* discussion of *Amstar* and *El Chico*.  Third, defendants contend, the geographic location and nature of the business was noted for many (though not all) of the listed businesses.

Defendants conclude:

> The exhibits speak for themselves and simply supplied what the Court asked for – evidence of the use of the terms "big" "little" and "lots" in business names.  Such evidence is absolutely relevant and material to this case.  The fact that the exhibits do not include additional information such as the dates of operation and other such information about which plaintiffs now complain is missing (over a year after the exhibits were submitted) does not entitle plaintiffs to have all of the exhibits stricken from the record.

---

[158] *See* Appendix I and Exhibits A, B, and C to Defendants' Brief Addressing the Widespread Use of the Term "Lots" and the Terms "Big" and "Little" in the Business World.

> At most, plaintiffs' criticisms of these exhibits would go the weight
> given by the Court to the exhibits, not their admissibility. However,
> following *Amstar, supra*, the exhibits are entitled to great weight.

## III.   Plaintiffs' Reply

According to Big Lots, defendants confuse the difference between authenticating a document and its ultimate admissibility. Regardless of the authenticity of the articles, Big Lots asserts, they contain inadmissible hearsay. In their present form, they are hearsay within hearsay only cured if defendants produce witnesses to testify that the out-of-court statement was made to them. *See Ray v. Edwards*, 725 F.2d 655, 658 (11th Cir. 1984)(in *dicta*, noting that the district court properly declared that newspaper articles contained inadmissible hearsay but allowing proponent to depose reporters).[159]

Here, plaintiffs argue, the only witness prepared to testify about the internet and computer research articles is one of defendants' counsel of record, Ms. Maughan. However, Ms. Maughan's affidavit only indicates that she can testify that she found the articles while doing computer research – not that the Big Lots representatives actually said what the articles claim they said. Plaintiffs quote *Macuba*: "We believe that the courts have used the phrases 'reduced to admissible evidence at trial' and 'reduced to admissible form' to explain that the out-of-court statement *made to the witness* (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose."

Regarding Ms. Maughan's affidavit concerning the use of the terms "Big," "Little," and "Lots," Big Lots argues, defendants have not addressed the primary failing in these materials, i.e.,

---

[159] Big Lots contends:

> [T]here is no identified witness that can testify under oath and subject to cross-examination, words to the effect of "I interviewed a Big Lots representative, and he told me X." For that reason, Defendants' claim that the internet and computer research articles are "non-hearsay" pursuant to Rule 801(d) also fail. Even if the statements in the articles are capable of being construed as an admission by a party-opponent, Defendants still have not identified any witness subject to cross-examination that can testify that the out-of-court statements actually were made by Big Lots representatives.

the failure to show that the "evidence" of third party usage affected the public's perception of the BIG LOTS marks (as required by the Eleventh Circuit in *University of Georgia Athletic Association v. Laite*).  Furthermore, Big Lots notes, defendants have not rebutted the argument that Big Lots enjoys a 95% recognition rate among households that frequent the Boaz-Guntersville marketplace.

According to Big Lots, *Amstar* is not on point factually and is out of step with more recent Eleventh Circuit cases on third party usage.  In *Amstar*, Big Lots point out, the plaintiff's mark was a single word, DOMINO, and the court there considered marks that were either identical to the plaintiff's mark or that contained the same dominant portion, DOMINO.  Here, there is no dominant portion in BIG LOTS.  Defendants' charts, Big Lots contends, do not contain another example of "BIG LOTS" but rather "show a clutter of business names that show 'Big,' 'Little,' and 'Lots' connected with one or more unrelated terms [that] do not even meet the standard set by Defendants' best case, *Amstar*."

In *Moseley*, Big Lots argues, the Supreme Court approved this view of the probative value of third party usage by noting with approval the Sixth Circuit's rejection of the defendant's argument "that Victoria's Secret could not be distinctive because 'secret' is an ordinary word used by hundreds of lingerie concerns" and concluding that the mark was "arbitrary and fanciful" despite the significant third party use to promote similar services.  Additionally, Big Lots relies upon *Exxon Corp. v. Texas Motor Exchange of Houston*, 628 F.2d 500 (5th Cir. 1980), where the court disregarded the proffered third party usage evidence.  The former Fifth Circuit found: (1) "there is no evidence in the record indicating that any other party besides Exxon Corporation uses EXXON," (2) plaintiffs rebutted defendants' evidence of other uses in Texas of the mark TEXON because (a) one was used by a company that went out of business in the 1950s, (b) one Texas entity had never actually engaged in business, (c) one company had stopped selling gasoline under the Texon name, and (d) another Texon Corporation had forfeited its charter in 1975.  Thus, Big Lots argues, countervailing more recent Fifth Circuit authority focuses on the same type of points made by Big Lots.

Big Lots deems *Amstar* "suspect because of its lack of concern for the geographic, temporal, and product remoteness of the alleged third party uses."[160]   Big Lots reiterates that recent cases require a showing that the third party uses affect public perception of the mark.  *See Miss Universe, Inc. v. Little Miss U.S.A., Inc.*, 212 U.S.P.Q. 425 (N.D. Ga. 1981)("The list of third-party uses submitted by the defendant has little evidentiary value on this issue other than to show that any combination of the words 'U.S.A.,' 'U.S.,' or 'United States' and 'Miss' is a popular name for a beauty pageant.  The defendant has not shown that these third-party uses have diminished the acknowledged strength of the plaintiff's mark"); *Breakers of Palm Beach* at 1584.

Although defendants' charts were submitted in response to a prior court order, Big Lots contends, that does not alter the requirement that specific evidentiary rules apply at the summary judgment stage.  Ultimately, Big Lots argues, those third-party usage charts are due to be excluded based upon Rules 402 and 403.

Finally, Big Lots contends, defendants waiver-based arguments lack merit.  With respect to the third-party usage charts, plaintiffs point out, Rule 26(a)(3) expressly reserves objections under Rules 402 and 403 and does not require that those objections be preserved in the time frame permitted by Rule 26(a)(3).  With respect to the internet and computer research articles, Rule 26(a)(3) gives the court authority to excuse an untimely failure to object for "good cause" (which Big Lots submits it has shown).  Since the pretrial conference scheduled for December 16, 2003 has been continued and the case has not been set for trial, Big Lots argues, defendants have ample time to attempt to cure their evidentiary problems.  Big Lots concludes: "[F]ailure to allow Plaintiffs' objections will riddle this Court's summary judgment considerations (and if necessary, the trial) with

---

[160] Big Lots relies upon *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160 (11th Cir. 1982).  After noting evidence that "a score of businesses . . . use the word Safeway in their names," the *Safeway* court held: "Moreover, we believe a further consideration relevant in determining the significance of third-party use is the entire name a third party uses, as well as the kind of business in which the user is engaged."

rank hearsay that would not otherwise be admissible in any circumstance."[161]

## CONCLUSIONS OF THE COURT

The defendants have overemphasized what this court supposedly "found" in its Findings of Fact and Conclusions of Law related to the preliminary injunction hearing. This court specifically stated: "In discussing the substantial likelihood of success on the merits, the court will not be making any final factual determinations. Neither are any findings of fact stated above to be considered final. They relate only to a consideration of the appropriateness of a preliminary injunction." This court now starts with a clean slate. This court does note that the parties agreed to some of the "facts" recited in its November 22, 2002 Findings of Fact and Conclusions of Law. Any such agreements should be considered admissions.[162] The plaintiffs have overemphasized the alleged criminal history of Walker. It will not affect this court's decision.

An initial issue is whether certain filings of the defendants should be stricken on plaintiffs' Motion to Strike. The plaintiffs have not denied that they did not timely object to defendants' Rule 26 disclosures. In this regard, the court gave the plaintiffs an opportunity to factually contest the pertinent exhibits. They have not directly disputed the exhibits or their contents. They have offered additional statements and explanations. The court will consider the Potter affidavit but deny the plaintiffs' Motion to Strike filed on December 2, 2003.

The parties have consented to the summary disposition of this case on the basis of evidence admissible for summary judgment purposes and have waived trial of this action.

The court will decide this case by addressing the factors stated in *Alliance Metals, Inc. v. Hinley Industries, Inc.*, 222 F.3d 895, 907 (11th Cir. 2000).[163] *Alliance Metals* applies the following

---

[161]   Big Lots repeats its double hearsay objection to Walker's proffered articles.

[162] The parties submitted some facts for inclusion in the court's November 22, 2002 Findings of Fact and Conclusions of Law. Others were not objected to when the court gave the parties an opportunity to do so.

[163] The court also adopts, without repetition, its observations, citations, quotes, reasoning, conclusions, and the agreed upon facts stated in its Findings of Fact and Conclusions of Law and

test to determine whether likelihood of confusion is present: " (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion."

The court must take into consideration the totality of the circumstances surrounding each particular case. *See Lone Star Steakhouse & Saloon, Inc. v. Lone Star Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997). "The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given to each of these factors varies with the circumstances of the case." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986).

### Strength of Plaintiffs' Mark

Except to the extent that the incontestability of plaintiffs' mark presumptively creates a "relatively strong mark," this court deems the terms "Big," "Lots," and "Big Lots" to be relatively weak marks. The term "Lots" is in widespread use in a number of contexts.[164] It is, at best, suggestive in nature. If it were not for its incontestable status, the BIG LOTS mark might well be considered descriptive.[165]

*Dieter v. B&H Industries of Southwest Florida*, 880 F.2d 322, 329 (11th Cir. 1989) held: "[I]ncontestable status is a factor to be taken into consideration in likelihood of confusion analysis.

---

Order entered on November 22, 2002 with regard to its denial of plaintiffs' application for preliminary injunction.

[164] Plaintiffs have also used the term "Odd Lots."

[165] A generic mark may never be registered. *Dieter* at 328. The court does not reach the issue of whether the mark is generic.

Because Dieter's mark is incontestable, then it is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." That case is controlling unless it conflicts with prior controlling Fifth Circuit cases. Apparently, the term "relatively" is not conclusive. For a discussion of other cases holding contrary to *Dieter* and commentators who have criticized its holdings, *see Lone Star Steakhouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 934-35 (4th Cir. 1995). Apparently, there has never been en banc consideration of the issue in the Eleventh Circuit. *See also Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166 (5th Cir. 1986). This court, of course, follows *Dieter* and presumes that the BIG LOTS mark is a "relatively" strong mark.

### Similarity of Marks

Obviously, the term "Lots" is the same in both marks. The terms "Big" and "Little" are obviously opposites. Word association alone would suggest some similarity. The wordplay association and similar products is also apparent in *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502 (11th Cir. 1985)("Ross" Diamond Cruiser and "Boss" Cruiser). That court held there to be no infringement. It is likely that one who hears "Little Lots" might think of "Big Lots," just as one who hears "Holiday Out" would think of "Holiday Inn."

Plaintiffs have emphasized that the court should consider its mark as a whole, not by its separate terms. For example, plaintiffs argued:

> Walker misapprehends cases like *Sun Banks* . . . . As the courts did in those cases, the analysis considers the entire mark, but properly may focus pro-portionately more attention on the dominant word in the parties' marks when combined with a word that is descriptive of the business (for example, "Sun" in SUN BANKS and SUN FEDERAL SAVINGS & LOAN), giving greater weight to the dominant word in the mark as opposed to unregistrable, descriptive or generic words like "Bank" or "Savings & Loan." . . . . Here, there is no dominant portion in BIG LOTS, and the mark must be evaluated in its entirety.[166]

Further, Plaintiffs' Reply in Further Support of Motion to Strike asserted: "In this case, the plaintiffs' primary mark at issue is BIG LOTS, not the word 'Big' or 'Lots' alone, and there is no

---

[166] *See* Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment (internal citations omitted).

dominant portion of the mark. Defendants' charts do not point to a single other use of BIG LOTS. Therefore, Defendants' charts that show a clutter of business names that show 'Big,' 'Little,' and 'Lots' connected with one or more unrelated terms do not even meet the standard set by Defendants' best case, *Amstar*." If, as plaintiffs suggest, the marks are looked at in their entirety, the similarity fades to minimal.[167] If this is the case, infringement is less likely, because "Little Lots" in its entirety is clearly different from "Big Lots" in its entirety.

### Similarity of Products

While both stores sell merchandise which might be considered closeout or liquidated merchandise, the merchandise sold by the defendants is more of a salvage type than that of plaintiffs. Actual shoppers would likely notice the difference.

### Similarity of Sales Methods

Both sell from large retail stores. The method of display is different. Actual shoppers would notice the difference.

### Similarity of Advertising

Plaintiffs' advertising is much more sophisticated and widespread than that of the defendants. The differences are obvious.

### Defendants' Intent

There may be a reasonable inference that the defendants recognized the play on words between "Big Lots" and "Little Lots" and intended a connection. There is no direct evidence of such intent or that defendants intended to gain a competitive advantage by using the name.

### Actual Confusion

There is little, if any, evidence of actual confusion. The plaintiffs' survey and other evidence merely suggest that people are likely to associate the terms "Big Lots" and "Little Lots" because of the use of the term "Lots" and the use of adjectives with opposite meanings. Otherwise, there is no

---

[167] Big Lots also relies upon *Ross* for the proposition that this court must take into account "the overall impression created by the mark[s] as a whole." *See Ross* at 1507.

real evidence of confusion.  It is likely that most shoppers would recognize "Little Lots" for what it is; a play on words without any real association between the stores.  To the extent that dilution may be a factor, the plaintiffs have not pursued a federal dilution claim.

The evidence related to "actual confusion" is weak, if existent.  There is no evidence that any customer has taken any action based upon confusion, actual or otherwise.  The only evidence is that some potential customers may relate the two marks through word association.  It is obvious that many would so relate them simply because of the common word "lots" and the contrasting terms "big" and "little."  On the other hand, anyone who visits the stores would see a substantial difference in products, layout, front name displays, etc.

This court is ultimately satisfied that the only factors which weigh in the plaintiffs' favor are:

(1) The strength factor if the incontestable status alone creates a strong mark.

(2) The similar use of the term "Lots" along with opposite meaning words.

(3) The fact that both parties sell closeout or liquidated merchandise.[168]

(4) Intent - There may be a reasonable inference of capitalization by wordplay by the defendants.  There is no direct evidence of such intent.  There is no other evidence of capitalization.

Not having a strong feeling one way or the other, this court recognizes the applicability of the "infallible" and "final" cliché.  The court also feels, however, that it must apply the preponderance of the evidence standard and what appears to be a substantially similar controlling case.

The following language from *Holiday Inns, Incorporated v. Holiday Out In America*, 481 F.2d 445 (5th Cir. 1973) is apt:

> Plaintiff's evidence to show the likelihood of confusion or

---

[168] As noted in this court's November 22, 2002 Findings of Fact and Conclusions of Law, Big Lots is in the business of "closeout retailing" ("the business of selling broad line merchandise at below-discount prices"), and Little Lots is engaged in the "discount sale of miscellaneous merchandise" including some name-brand items and some items not associated with a known name-brand.  The "Little Lots" products are not as well-displayed.  They have more of a salvage appearance.

misunderstanding begins with a comparison of the three marks Holiday Out, Holiday Out in America, and The Nation's Campground used by the defendants with three of its own service marks, Holiday Inn, Holiday Inn of America, and the Nation's Inn-keeper. Other evidence introduced by plaintiff included nine letters and a memorandum of a telephone call purporting to evidence actual confusion, the results of a survey, and the video deposition of an expert philologist and lexicographer. The trial judge considered all of this evidence but concluded it merited little weight. (Footnote omitted).

*Id.* at 447.

. . . In this case the trial court found that the survey degenerated into a mere word-association test entitled to little weight because the format failed to account for the number of responses attributable to use of the word "Holiday" as distinguished from the service mark Holiday Out.

Plaintiff admits that the word "Holiday" is used, alone or in combination with words other than "Inn," throughout the United States, including the states of Tennessee and Florida, to designate motels and restaurants not affiliated in any way with plaintiff. The common word "Holiday" is of weak trademark significance. *E.g., El Chico, Inc. v. El Chico Café*, 214 F.2d 721, 725 (5 Cir. 1954). Indeed, in a footnote in an opinion denying Holiday Inn's opposition, the Trademark Trial and Appeal Board noted that in a civil action against plaintiff's use of Holiday Inn by the owner of the service mark Holiday Motor Hotels, Holiday Inn defended that suit "on the ground that 'Holiday is a common word and it has been and is widely used by others' for motel services."

However, due to plaintiff's extensive advertising and its success in developing a large chain of motels throughout the United States, it is likely that many persons asked to associate a business organization with the word "Holiday" would think of "Holiday Inn." We agree with the trial court that the failure of the survey to consider the effect that the word "Holiday" alone had on the responses and the techniques employed in conducting the survey rendered this evidence of slight weight. For a similar situation, *see Miles Laboratories, Inc. v. Frolich*, 195 F. Supp. 256 (S.D. Cal.), *aff'd*, 296 F.2d 750 (9 Cir. 1961), *cert. denied*, 369 U.S. 865, 82 S. Ct. 1030, 8 L. Ed 2d 84 (1962).

Plaintiff relies heavily upon the testimony of a noted lexicographer that the words "in" and "out" are intertwined in their meanings, so that one is normally defined with respect to the other. The contention is that a person seeing or hearing the word "out" will echo in his mind the word "in," which is pronounced the same as "inn." Thus, it is asserted that a person seeing the words "Holiday Out" would think of the words "Holiday Inn." However, the lexicographer's testimony clearly shows that the context of words must be considered and that the word "out" would not necessarily evoke the word "in" except in certain contexts. The trial court correctly found that the manner of advertising and use of the defendants' marks would not be likely to cause a prospective customer to conclude that the defendants were in any way affiliated or connected with plaintiff.

*Id.* at 448. (Emphasis added).

> . . . .
>
> Holiday Inn also contends that a comparison of the marks used by the defendants with its own will adequately demonstrate the intent of the defendants to adopt a colorable imitation of the marks. While acknowledging that intent is not a necessary element of infringement, it asserts that such evidence compels a finding of infringement, citing *National Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co.*, 362 F.2d 374 (5 Cir. 1966), and *Aetna Casualty & Surety Co. v. Aetna Auto Finance, Inc.*, 123 F.2d 582 (5 Cir. 1941). <u>However, in those cases, the court held that the actions of the parties clearly indicated an effort on the part of the offending parties to confuse the public. Here, as the trial court found, defendants' business and advertising was not conducted in a manner to suggest a connection between the two businesses. Furthermore, plaintiff's argument is circular. It argues that confusing similarity of the marks is proved by the defendants' intent to confuse the public and that the defendants' intent to confuse the public is proved by the confusing similarity of the marks. The obvious flaw in the argument is that it requires the court to assume that which is to be proved.</u>[169]
>
> Considering all of the evidence adduced, this court holds that the trial court correctly rejected plaintiff's contention that there was a likelihood of confusion as to the source of the services involved.

*Id.* at 449. (Emphasis added). This court also calls attention to the discussion in *Holiday Inns, Inc.* as to the state law claims. *See* pages 449-450. That discussion militates against plaintiffs' state law claims here.

*See also Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311 (5th Cir. 1981); *First Southern Fed. Sav. & Loan Ass'n of Mobile, Alabama v. First Southern Sav. & Loan Ass'n of Jackson County, Mississippi*, 614 F.2d 71 (5th Cir. 1980); *Sears Roebuck & Co. v. All States Life Ins. Co.*, 246 F.2d 161 (5th Cir. 1957); *Sun-Maid Raisin Growers of California v. Sunaid Food Products, Inc.*, 356 F.2d 467 (5th Cir. 1966).[170]

This court recognizes that another controlling case, *National Association of Blue Shield*

---

[169] These last three sentences have substantial application to the "intent" element here.

[170] In his dissent in *Citibank, N.A. v. Citibank Group, Inc.*, 724 F.2d 1540, 1551 (11th Cir. 1984), Judge Vance emphasized the *Sun Banks* case. *See* Judge Vance's full dissent. This court does not reach the issue of whether the mark could not be registered because it is generic. *See Dieter*. The court also does not reach the issue of whether plaintiffs could have or should have registered other variations related to "Lots."

*Plans v. United Bankers Life Insurance Company*, 362 F.2d 374 (5ᵗʰ Cir. 1966), arguably supports plaintiffs' position.  However, the facts of that case appear more distinguishable than those in *Holiday Inns, Inc.*[171]  The use of a shield and a color is stronger than the use of "Lots" and quantity terms here.

Unlike in some cases, there is no substantial evidence here of copying by the defendants of plaintiffs' depictions of their storefronts, advertising, etc.  The use of the term "lots" with a quantitative reference is the only similarity other than the retail sales of discounted products.  Query: How many uses of the word "lots" do the plaintiffs have protected in the absence of specific registrations?  Small Lots?  Large Lots?  Tiny Lots?  Most Lots?  Some Lots?  Mini Lots?  Mega Lots?  Major Lots?  Minor Lots?  Average Lots?  Diminutive Lots?  Minute Lots?  Minuscule Lots?  Greatest Lots?  Modest Lots?  Huge Lots?  Slight Lots . . . . ?

The court will enter judgment in favor of the defendants.  The court cannot conclude, by a preponderance of the evidence, that there is or will be likelihood of confusion between the two businesses.  There may be discussion of the association of the names, but not likely actual confusion.  There is no evidence that any alleged confusion has affected any customer's purchasing decision(s), has caused any customer to make a payment to the wrong store, or has caused any customer to deal in any way with the wrong store or otherwise be confused.  The only "evidence" of confusion is through word association.  This would not appear to be "actual" confusion.[172]  This court cannot

---

[171] Interestingly, the writer in *National Association of Blue Shield Plans* was the dissenter in *Sears Roebuck & Company*.

[172] To the extent that plaintiffs' survey proves anything, it may prove dilution, but not actual confusion.  If this had been a federal dilution case and the plaintiffs had proved injury, there might be a different issue.  *See Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003).  Plaintiffs' apparent inability to support a federal dilution claim with proof of injury also suggests that there has been no actual confusion.  Other than by word association, there is no proof of likelihood of confusion.  If only word association coupled with an incontestable mark is sufficient, this court's decision is likely wrong.  However, the court again notes the following sentences in *Holiday Inns*: "Furthermore, plaintiff's argument is circular.  It argues that confusing similarity of the marks is proved by the defendants' intent to confuse the public and that the defendants' intent to confuse the public is proved by the confusing similarity of the marks.  The obvious flaw in the argument is that it requires the court to assume that which is to

substantially distinguish *Holiday Inns, Inc.* or find that plaintiffs have prevailed by a preponderance of the evidence.

This 10th day of March, 2004.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

be proved."

89